STATE EX REL. JOHNSON, ET AL. *v.* BOYD, ET AL.
STATE EX REL. JOHNSON, ET AL. *v.* VIETS, ET AL.
STATE EX REL. JOHNSON, ET AL. *v.* KRACK, ET AL.

[Nos. 27,378, 27,377, 27,379, respectively. Filed June 28, 1940.]

350

*W. W. Johnson, John A. Riddle, Fred H. Thoms,* and *John H. Weddle,* all of Terre Haute, for appellants.

*Lewis & Lewis, Ramsey & Grayson,* and *Emison & Emison,* all of Vincennes; and *Slaymaker, Merrell & Locke,* and *Fesler, Elam, Young & Fauvre,* all of Indianapolis, for appellees.

SWAIM, J.—Separate actions were filed in the name of the State of Indiana on the relation of Joseph M. Johnson and Sarah E. Johnson, taxpayers of the school city of Vincennes, Indiana, for the benefit of themselves and all other taxpayers of said school city, seeking to recover for the use and benefit of the said school city on the school treasurer bonds given by Claudius L. Boyd, as principal, and United States Fidelity & Guaranty Company as surety; by William A. Viets, as principal, and American Employers' Insurance Company of Boston, Massachusetts, as surety; and by Raymond J. Krack, as principal, and American Employers' Insurance Company of Boston, Massachusetts, and The Metropolitan Casualty Insurance Company of New York, as sureties. Said Boyd was the treasurer of said school city during the school year 1933-34, said Viets during the school year 1934-35, and said Krack during the school years of 1935-36, 1936-37.

Each of said complaints was the same in all essentials except as to the defendants and as to the amounts

alleged to have been illegally paid by said respective treasurers from the school funds of said school city.

In each complaint it was alleged that the particular defendant treasurer had "improperly, unlawfully, wrongfully and in violation of the covenants of his said bonds, diverted, misappropriated, paid out, disbursed and expended from the common school funds and other school revenues of said school city," large amounts of money; that said monies were "paid out and disbursed, in aid of certain private, religious, sectarian and theological institutions, to-wit: private Roman Catholic parochial schools within said city of Vincennes"; that said payments in specified amounts were made to certain individuals who were Catholic Sisters; that none of said Sisters "to whom said payments were made, as aforesaid, were employed as teachers, or otherwise, in any of the lawfully, properly and regularly constituted public schools of said school city; that all of said expenditures were misappropriated, diverted and paid in the aid, benefit and support of said parochial schools; that said schools now are, and at the time of all of said payments to them were, private, sectarian and denominational institutions controlled by, and maintained under, the creed and influence of the religious organization known as the Roman Catholic Church; that said schools are directed and controlled through the clerical government of said church, exercised by and through the Bishop thereof, as the titular head of the Indianapolis diocese of said church; that said sisters, to whom said payments were made, neither received nor retained said payments as their own secular or private property or income, or any part thereof; . . . that the payment of said moneys to said sisters was a mere subterfuge to subsidize said schools and make donations from the school treasury to

said church through said schools and through said sisters; that said disbursements were made in furtherance of an unlawful scheme to accomplish, indirectly, that which . . . could not be done directly; that all of said payments were withdrawals from the school treasury of the City of Vincennes, as subsidies for the aid and support of said private and religious institutions; that all of said disbursements complained of gave preference to a sectarian creed and religious societies and prevented the administration of a general and uniform system of public schools in said city of Vincennes and extended special privileges to children of a particular religious faith."

Said complaint prayed judgment for and on behalf of the taxpayers of said school city for the use and benefit of said school city against the said defendant treasurers, as principals, and against their sureties, as such, for all of said sums so expended together with certain interest and penalties thereon.

The defendants in each of said cases filed answers in general denial and special answers alleging that the amounts claimed by the plaintiffs to have been illegally paid were paid as teachers' salaries to teachers who were hired to and did teach in the public schools of said school city, under written contracts with the board of school trustees.

The three cases were consolidated for trial. There were special findings of fact and conclusions of law and the judgment in each case was for the defendants, from which judgments these three separate appeals are prosecuted.

The assignments of error and propositions in support thereof are the same in each appeal and we shall, therefore, discuss them as if they constituted one appeal.

The facts essential to the determination of the questions presented by this appeal, as disclosed by the special findings are substantially as follows: On July 28, 1933, a committee of priests of the Roman Catholic Parishes in the school city of Vincennes, advised the Board of School Trustees of said city that the Catholic Parochial Schools within the said school city would not be opened by the churches for the ensuing school year and asked said school trustees to provide necessary school facilities for the eight hundred school children who had theretofore attended the said parochial schools, to-wit: St. Francis Xavier, St. John's Sacred Heart, St. Rose Academy, and Gibault. Thereupon the Board of Trustees of said school city passed a motion that they "assume the administrative and instructional obligation for the Catholic Parochial Schools included within the limits of said School City, in accordance with the constitutional and statutory laws of the state, the rules and regulations of the State Department of the Board of Education and the existing rules and regulations of the Board of School Trustees of the City of Vincennes with a definite understanding that the school city of Vincennes assumes no outstanding, existing or future financial obligations, either bonded temporary loans or other evidences of indebtedness, or the operation, maintenance and capital outlay costs for buildings and grounds belonging to the Catholic Parochial Schools"; and at the same time the board authorized the superintendent to proceed at once and work out the administrative details of the proposed plan of incorporation. On March 18, 1935, said board adopted a resolution, to be effective at the close of the school year 1934-35, rescinding said original motion. On August 25, 1935, said board of school trustees adopted a resolution

reconsidering and amending the resolution of July 28, 1933, as follows:

"Be it resolved by the Board of School Trustees of the School City of Vincennes, Indiana, that whereas the effects of the depression have brought about an economical condition in our city by reason of which an emergency exists regarding the operation and maintenance of the parochial schools of Vincennes and whereas the Board of School Trustees of said School City are of the opinion that the patrons of our parochial schools are entitled to public aid and assistance during these extraordinary times in which we are living; therefore, be it resolved by the Board of School Trustees of the School City of Vincennes that the School City of Vincennes assume the administrative and instructional obligation for the school children of the parochial schools included within the limits of said School City in accordance with the constitution and the statutory laws of the state, the rules and regulations of the State Department of the Board of Education and existing rules and regulations of the Board of School Trustees of the School City of Vincennes, for all grades in said parochial schools to and including the sixth grade with a definite understanding that the School City of Vincennes assumes no outstanding, existing or future financial obligation, either bonded temporary loans or other evidences of indebtedness or the operation, maintenance and capital outlay costs for buildings and grounds belonging to the parochial schools."

On October 2, 1935, the board adopted the following resolution:

"Whereas, heretofore, the St. Francis Xavier School, the St. John School and Sacred Heart School, because of lack of funds were not going to open for the school year 1935-1936, and whereas notice had been given to this Board that such schools would not operate during said school year, and whereas the children formerly attending such schools could not in the opinion of this Board be

properly cared for in the school buildings owned by the School City it was deemed advisable and necessary to take over and make a part of the public schools and the school system of this school city the St. Francis Xavier School, St. John School, and Sacred Heart School, and whereas, a resolution was passed by this Board on the fifth day of August, 1935, which was not full and complete and did not express the intention of the Board nor the purpose intended by the adoption of said resolution, now, therefore, be it resolved by this Board that the St. Francis Xavier School, the St. John's School, and Sacred Heart School of Vincennes up to and including the sixth grade be and they are hereby made a part of the public schools and the public school system of the School City of Vincennes and subject to all of the rules and regulations of the public school system. The course of study pursued and to be pursued in said schools and the textbooks used and to be used therein arranged and to be arranged to conform to the curriculum now in effect in all the other public schools in the school city.

"Be it further resolved that no sectarian instruction shall be permitted during school hours in said schools; be it also further resolved that the buildings and equipment formerly used by the said St. Francis Xavier, St. John and Sacred Heart Schools shall be used by this School City but it shall pay no rent for such use."

The Superintendent of the Vincennes City Schools, acting under authority given him by said board of school trustees procured recommendations for teachers for said schools from various Roman Catholic colleges. All teachers so recommended were Sisters and Brothers in various Catholic orders. The Board of School Trustees of said school city employed as teachers in said schools the teachers so recommended for the school year 1933-34 and for each subsequent year. Each teacher so employed was regularly licensed to teach school agreeable with the laws of the State of Indiana.

The teachers taught in said schools the course of study prescribed by the State Board of Education. The school city of Vincennes at no time obtained a lease, rental contract or contract of any kind or character authorizing it to use the buildings of said parochial schools, but without any contract or other obligation to the school city of Vincennes to do so the Roman Catholic authorities have provided the several school buildings used by said schools, together with all seats, desks, furniture and furnishings, heat, light, water, fuel and janitor service for each building during the school years 1933-34 to and including the school years 1938-39, all without expense to or obligation upon the school city of Vincennes.

The Gibault High School was discontinued at the close of the school year 1934-35.

In addition to other pictures the school rooms in each of said buildings had hanging on the walls, in view of said students, a picture of Jesus, The Holy Family, The Crucifixion, and George Washington. They also each have an American Flag and a Holy Water fount, in which is kept Holy Water for the use of the pupils. While teaching the teachers wore the characteristic robes of the order to which they belonged and the sisters always wore a rosary and crucifix in view of the pupils.

On the grounds near each of said schools there is located a Roman Catholic Church, a rectory or priests' home and a sisters' home. Each morning, immediately prior to the beginning of the school, the pupils of each room were caused to attend at the nearby church where they were given religious instructions for thirty minutes by the parish priest. This particular service is said to be voluntary. So far as shown no pupil attend-

ing any of said schools has refused or failed to attend such morning services for religious instruction.

Prior to the school year 1933-34 the school city of Vincennes owned, maintained and operated nine public schools. Prior to the beginning of said school year the school authorities had divided said school city into school districts and assigned all the pupils below high school grades living in each district to a certain school, which they were required to attend unless transferred elsewhere. Beginning with the school year 1933-34 the children of the Roman Catholic families living within the school city of Vincennes were not required to attend the school assigned to the district in which they lived nor were they transferred elsewhere. They continued to attend the same schools that they had been attending theretofore, without regard to the boundaries of the school district in which they lived.

Since the beginning of the school year 1933-34 the schools in question have been visited, occasionally, by the Superintendent of the Vincennes City Schools and, frequently, by the director of instruction in the elementary grades of the city schools. Throughout the period in question the school city of Vincennes "has paid the administrative and instructional obligations" of all of the schools mentioned from public school funds.

Upon these facts the court stated conclusions of law as follows:

"1. That throughout the period complained of in plaintiff's complaint said schools, to-wit, St. Francis Xavier, St. John's Sacred Heart, St. Rose Academy and Gibault were Roman Catholic Parochial schools, and not public or common schools of the State of Indiana within the Constitution and laws of the state.

"2. That in paying the administrative and instructional obligations of said schools during the time that

such payments have been made the Board of Trustees of the School City of Vincennes accomplished a governmental purpose and duly imposed upon it by the law, though the method of its accomplishment is forbidden by law.

"3. That the law is with the defendant, and the plaintiff should take nothing herein."

The first alleged error assigned by the appellant is a joint assignment as to all the court's conclusions of law and is, therefore, bad if any of said conclusions is correct. *Kime* v. *Vetter* (1909), 172 Ind. 317, 88 N. E. 497.

The third assignment of error was that the court erred in overruling the motion for a new trial. The reasons assigned for a new trial were that the finding of the court was not sustained by sufficient evidence and was contrary to law; that the judgment of the court was not sustained by sufficient evidence and was contrary to law; and that the court erred in its conclusions of law on the facts found. Since the evidence is not in the record this court cannot consider the ground that the finding of the court was not sustained by sufficient evidence or was contrary to law. *General Ice & Coal Co.* v. *George, Tr.* (1938), 214 Ind. 518, 523, 14 N. E. (2d) 1002.

Assigning as a cause for new trial that the judgment is not sustained by sufficient evidence or is contrary to law raises no question. *Lynch* v. *Milwaukee Harvester Co.* (1903), 159 Ind. 675, 65 N. E. 1025. A motion for a new trial is not a proper method of assailing the correctness of the conclusions of law. *Smith* v. *James* (1891), 131 Ind. 131, 30 N. E. 902.

The fourth assignment of error to the effect that the judgment and decision of the court is contrary to law is not sufficient either as a separate assignment of error or as a ground for a new trial.

The appellees contend that the second error assigned, which is as follows: "The court erred in its conclusions of law numbered two and three, respectively," is a joint assignment as to conclusions of law numbered 2 and 3. With this contention we cannot agree. We believe that the addition of the word "respectively" to this assignment makes it several as to the two conclusions. One of the definitions given by the appellees from Webster's Universal Unabridged Dictionary (1937) is "as relating to each." This is sufficient to make the assignment several as to each of the two conclusions.

The appellees have assigned cross-errors (1) that the court erred in its first conclusion of law and (2) that the court erred in its second conclusion of law, but ask that the judgment be affirmed.

The first conclusion of law, to the effect that throughout the period complained of the schools were Roman Catholic Parochial Schools and not public or common schools of the State of Indiana within the constitution and laws of the State, is a finding of an ultimate fact and for that reason cannot be considered as a conclusion of law. It is a question of fact as to whether a certain school from its method of operation, from its control, and from the various other circumstances surrounding it constitutes a public or private school. Since it is a finding of fact it cannot be considered as a conclusion of law; and since it is stated as one of the conclusions of law it cannot be

considered in aid of the findings of fact. *Klinger* v. *Ottinger* (1939), 216 Ind. 9, 22 N. E. (2d) 805, 807.

Both the appellants and the appellees admit that the second conclusion of law, as stated by the court, is not correct. The appellants insist that the first part of said conclusion is erroneous and the appellees contend that the latter part thereof does not correctly state the law.

There is left, then, only the third conclusion of law to justify the judgment. We must next determine whether said third conclusion, to-wit: "That the law is with the defendant, and the plaintiff take nothing herein," is sufficient to support the judgment and, if so, whether said conclusion is supported by the facts as found by the court. In *Coburn* v. *Sands* (1898), 150 Ind. 141, 48 N. E. 786, this court held that an erroneous conclusion of law is harmless if other conclusions of law which are correct justify the judgment rendered by the court. In *First National Bank* v. *Arnold* (1901), 156 Ind. 487, 60 N. E. 134, it was stated that, while correct practice requires that a conclusion of law should be stated upon every issue of fact formed by the pleadings and tried by the court, bare conclusions as to which party should recover judgment may be held sufficient in cases where it clearly appears that upon the facts found the law is in favor of the party in whose favor they are announced. This court in *Klinger* v. *Ottinger, supra,* held that the simple statement that the law is with the plaintiff is a sufficient conclusion of law upon which to base a valid judgment. This third conclusion, then, is sufficient to justify the judgment, if the facts found justify the conclusion.

The principal question presented by this appeal is whether, under the facts in this case, the payments

made by said school treasurers to said teachers are legal. The appellants contend that such payments were illegal and that the amount thereof should be returned to the school city because, according to the allegations of said complaint, the schools continued to be parochial schools, under the domination and control of the Roman Catholic Church, and the payments to said teachers were a mere subterfuge by which donations were actually made to said church.

Our state constitution expressly provides, "No money shall be drawn from the treasury, for the benefit of any religious or theological institution." (Article I, § 6), and § 4 of said Article provides that, "No preference shall be given by law, to any creed, religious society or mode of worship; and no man shall be compelled to attend, erect, or support, any place of worship, or to maintain any ministry, against his consent." Neither of these provisions may be legally violated, either directly or indirectly and any public official knowingly paying money from the public treasury in violation of these provisions would be required to reimburse said treasury for any amounts so paid. Have the appellants proved that the appellees, either directly or indirectly, violated either or both of these constitutional provisions?

Our investigation of the question is limited to the special findings of fact, bearing in mind the rule that a failure by the court to find a fact for a party having the burden of proof is equivalent to a finding against him. *Michigan City* v. *State ex rel. Seidler* (1937), 211 Ind. 586, 5 N. E. (2d) 968. In the special findings there is no express finding that the schools in question were parochial schools during the period from 1933 to 1937. The findings cannot be aided by conclusions of law. *Shedd* v. *American Maize*

*Co.* (1915), 60 Ind. App. 146, 163, 108 N. E. 610. It follows, therefore, that unless the primary facts found necessarily lead to the ultimate fact that these schools were parochial schools and that a payment to the teachers thereof, amounted to an indirect payment or donation to the church, or unless some one or more facts found be sufficient to make the payments to these teachers illegal, the conclusion of the court that the law was with the defendants was justified by the findings of fact.

Some of the apparent confusion and conflict in the findings of fact may be attributed to the use of the word "school" therein. The word is defined in Corpus Juris as follows: "The word 'school' is a generic term, denoting an institution or place for instruction or education, or the collective body of instructors and pupils in any such place or institution." 56 C. J. 167, § 1.

As the word is used in several places throughout the findings it was, undoubtedly, intended to mean or denote only a particular place for instruction. For instance, when the board of trustees of said school city in the first resolution passed spoke of assuming the administrative and instructional obligations for the Catholic Parochial schools included within the limits of said school city, and in the same resolution said that this was to be done in accordance with the constitution and statutory laws of the state, the rules and regulations of the State Department of the Board of Education and the existing laws and regulations of the Board of School Trustees of the City of Vincennes, the Board must have intended to say thereby that they were going to assume the instructional obligations or expense for schools to be conducted at the place where said parochial schools had been conducted. And again

when the court in said special findings spoke of the treasurer as having "paid instructional obligations of said schools," naming them, it must have intended to designate only the names of the *places* where said schools were conducted, because the court also found that the teachers were employed by the board of trustees of the school city of Vincennes and it, therefore, necessarily follows that the obligation to pay said teachers under said contracts of employment was the obligation of said school city and not the obligation of the church society owning said school buildings and grounds.

It was the legal duty of the Board of School Trustees to provide necessary school facilities for all of the school children within said school city. A committee ▮ of priests of the Roman Catholic Parishes of said city informed the Board that the parochial schools, which had been theretofore conducted by the churches within said school city, would not be opened by the churches for the school year 1933-34, and said priests requested that said school trustees provide the necessary school facilities for the 800 or more school children of said school city who had theretofore been attending such parochial schools. The Board of School Trustees complied by employing teachers who were regularly licensed to teach school agreeable with the laws of the State of Indiana and with such teachers established schools in the school plants formerly occupied by said parochial schools. These teachers taught the course of study prescribed by the State Board of Education. No sectarian instruction was permitted in said schools during school hours. The schools were visited occasionally by the superintendent of the Vincennes City Schools and frequently by the Director of Instruction in the elementary grades of said city schools.

The teachers were paid their salaries from public funds by the treasurer of the school city. In view of these findings it cannot be said that the primary facts found by the court necessarily lead to the conclusion that the schools in question during this period were not public schools or that the salaries paid amounted to contributions made indirectly to parochial schools or to the church.

We must next determine whether any of the facts found, or any combination of them, made the payment of said teachers' salaries by said treasurers illegal.

The church authorities provided the several school buildings, in which said schools were conducted, together with the furniture, utilities and janitor services, during the school years 1933-34 to 1938-39, both inclusive. This was done without any lease or rental contract. Our statutes provide that the "school trustees shall take charge of the educational affairs of their respective townships, towns and cities. They shall employ teachers, establish and locate, conveniently, a sufficient number of schools for the education of children therein, and build, or otherwise provide, suitable houses, furniture, apparatus and other articles and educational appliances necessary for the thorough organization and efficient managements of said schools." § 28-2410, Burns' 1933, § 5967, Baldwin's 1934. In this case we find the Board of Trustees faced with an emergency to provide school facilities for more than 800 additional school children. In the opinion of the trustees they could not be properly cared for in the buildings owned by the school city. There is no statutory provision in this state prohibiting school trustees under such circumstances from leasing for school purposes any buildings and equipment which are suitable for such purposes. Nor is there any statutory limita-

tion as to the persons or societies from whom such buildings and equipment may be leased. We see no valid reason why the said school trustees should not have leased the buildings and equipment furnished by the church authorities.

Acting within their discretion, the Board of Trustees may well have assumed that the emergency was temporary and that they would not be justified in buying or building new buildings or in making additions to the buildings which the school city then owned, even if the finances of the school city had made it possible for them to do so. They may well have assumed that as soon as the churches became financially able to do so the parochial schools would be re-established; and that the parents of the pupils in question would then desire their children to attend such parochial schools. In *Dorner* v. *School District No. 5* (1908), 137 Wis. 147, 118 N. W. 353, it was held that the lower court was not in error in refusing to enjoin the district and board from maintaining a common school in a parochial school building. It was held legal to maintain a public school in a church basement in the case of *Millard* v. *Board of Education* (1887), 121 Ill. 297, 10 N. E. 669, in which case the court said:

"As to the first allegation—that the schools have been maintained in the basement of a Catholic church—no importance whatever can be attached to a fact of that character. If the district where the school was maintained had no school house, and it became necessary for the board of education to procure a building to be used for school purposes, they had the right to rent of any person who had property suitable for school purposes; and whether the owner of the property was a Methodist, a Presbyterian, a Roman Catholic, or any other denomination, was a matter of no moment, nor was it material that the building selected had been used as a church."

The fact that the church contributed the use of the buildings and equipment used for these schools does not make the schools conducted therein parochial schools. The acceptance of private donations to a public cause does not make the cause private. *Holt* v. *Town of Antrim* (1887), 64 N. H. 284, 9 A. 389. Since the teachers in said schools were employed by the Board of School Trustees, teaching the course prescribed for the public schools, such teachers were the employees of the school city and their possession of said premises was the possession of the school city. *Richter* v. *Cordes* (1894), 100 Mich. 278, 58 N. W. 1110. The fact that a church, a rectory or Priests' home, and a Sisters' home were located on the grounds near each ·of said schools does not affect the right of the school city to use said school buildings.

The appellants also stress the fact that in the school rooms in each of said buildings, in addition to other pictures in view of the pupils, there were the pictures of Jesus, The Holy Family, the Crucifixion and George Washington and that each room was also provided with an American Flag and with a Holy Water fount, in which Holy Water was kept for the use of the pupils. Such pictures and furnishings do not constitute sectarian teachings in the schools. No secret was made of the fact that the equipment and buildings belonged to the Catholic Church and we see no valid reason why all evidence of that fact should have been concealed.

The appellant also complains of the fact that the teachers employed by the said school trustees were Catholic Sisters and Brothers, recommended for such positions by the authorities of various Catholic colleges, and that such teachers, while

teaching, wore the dress of their religious orders. The fact that these teachers were recommended by various Catholic normal schools cannot be considered an important factor. The teachers were employed by the Board of School Trustees. They were chosen from persons regularly qualified and licensed to teach school agreeable to the laws of the State of Indiana. It is the duty of school trustees to investigate the character and fitness of teachers. The trustees may do this in any proper manner which they may choose, including the procuring of recommendations. Recommendations from any reliable normal college should be helpful. The choice of teachers is within the discretion of the school trustees and unless such discretion be abused the courts will not interfere. *State ex rel. Mitchell* v. *Gray* (1883),. 93 Ind. 303, 305.

Nor is there any law in Indiana which prevents school trustees from hiring persons of any religious faith or members of religious orders as school teachers.

Sections 2, 3, and 5 of Article I of the Constitution of Indiana, provide as follows:

"All men shall be secured in their natural right to worship Almighty God, according to the dictates of their own consciences."

"No law shall, in any case whatever, control the free exercise and enjoyment of religious opinions, or interfere with the rights of conscience."

"No religious tests shall be required, as a qualification for any office of trust or profit."

No statute or rule prohibiting the employment of teachers belonging to a certain religious denomination or sect could be held valid. The employment of the teachers in this case certainly could not be held invalid because such teachers belonged to certain orders of the Catholic Church. The employ-

ment of teachers is within the discretion of the school trustees so long as such teachers meet the qualifications required by law. Membership in any particular church can neither legally qualify nor disqualify a teacher.

Nor does the fact that these teachers in question, while teaching, wore the robes of various orders to which they belonged constitute sectarian teaching or make it illegal for them to be paid their salaries as teachers. In *Hysong* v. *School District of Gallitzin Borough* (1894), 164 Penn. 629, 30 A. 482, the court held that Catholic teachers appearing in the school room in the habits of their orders did not constitute sectarian teaching and in reference thereto said:

"The religious belief of many teachers, all over the commonwealth, is indicated by their apparel. Quakers or Friends, Omnish, Dunkards, and other sects, wear garments which at once disclose their membership in a religious sect. Ministers or preachers of many Protestant denominations wear distinctively clerical garb. No one has yet thought of excluding them as teachers from the schoolroom on the ground that the peculiarity of their dress would teach to pupils the distinctive doctrines of the sect to which they belonged. The dress is but the announcement of a fact—that the wearer holds a particular religious belief. The religious belief of teachers and all others is generally well known to the neighborhood and to pupils even if not made noticeable in the dress, for that belief is not secret, but is publicly professed. Are the courts to decide that the cut of a man's coat or the color of a woman's gown is sectarian teaching because they indicate sectarian belief? If so, then they can be called upon to go further. The religion of the teacher being known, a pure, unselfish life, exhibiting itself in tenderness to the young, and helpfulness for the suffering, necessarily tends to promote the religion of the man or woman who lives it. Insensibly, in both young and old, there is a disposition to reverence such a one and at least, to

some extent, consider the life as the fruit of the particular religion. Therefore, irreproachable conduct, to that degree, is sectarian teaching."

To the same effect see *Gerhardt* v. *Heid* (1936), 66 N. D. 444, 267 N. W. 127.

The appellants also contend that it is significant that each morning, immediately prior to the beginning of school, the pupils were caused to attend at the nearby Roman Catholic Church where they were given religious instructions for thirty minutes by the Parish Priests. The findings do not disclose by whom the children were "caused" to attend. The finding does disclose that the service was said to be voluntary. Since the children in question were children of Catholic parents and the service was voluntary and not within the school hours we fail to see that this amounts to sectarian teaching within the schools or that it could be held to make the schools parochial schools rather than public schools.

Although it was alleged in the complaint that these schools were directed and controlled through the clerical government of the church exercised by and through the Bishop, there was no such finding by the court. Whether these schools, during the period in question, were parochial or public schools is determined by their control. They were in charge of teachers employed by the board of trustees of said school city. The teachers were regularly licensed under the laws of the State of Indiana. The course of study was that prescribed by the Board of Education. The schools were visited and supervised by the Superintendent of City Schools and the Director of Instruction of the city schools. The teachers were paid from the public funds. The space occupied by the schools was in the possession of the school city through its employed

teachers. It is our opinion that the board of school trustees of the said school city by their course of action did establish public schools in the buildings formerly occupied by the parochial schools and that the payment, by the various treasurers of the school city, to said teachers of salaries provided by their contracts of employment was valid.

Finding no reversible error the judgment in each of said three cases is affirmed.

Shake, J., not participating.

NOTE.—Reported in 28 N. E. (2d) 256.