Veronica EMBRY, Thomas G. Burns, George Nickas, and David Hoffman, Appellants (Plaintiffs below),

v.

Frank O'BANNON, in his official capacity as Governor of Indiana, and Suellen Reed, in her official capacity as Superintendent of Public Instruction for the State of Indiana, Appellees (Defendants below).

No. 49S02–0310–CV–479.

Supreme Court of Indiana.

Oct. 29, 2003.

Kenneth J. Falk Indianapolis, IN, Attorney for Appellants.

Steve Carter, Attorney General of Indiana, Thomas M. Fisher, Special Counsel, Laureanne Nordstrom, Deputy Attorney General, Ellen H. Meilaender, Deputy Attorney General, Attorneys for Appellees.

DICKSON, Justice.

This is an appeal from a summary judgment denying relief in an action brought by four Indiana taxpayers against Governor Frank O'Bannon and Superintendent of Public Instruction Suellen Reed, head of the Indiana Department of Education (collectively termed "the State"). The taxpayers' lawsuit challenges the "dual-enrollment" process whereby the State provides public funds "which are used to pay teachers who teach classes in parochial schools and which are used to provide such things as internet services to parochial schools." Br. of Appellants at 10. The taxpayers contend that this practice violates Article 1, Section 6 of the Indiana Constitution, which states: "No money shall be drawn from the treasury, for the benefit of any religious or theological institution." (Hereafter "Section 6.") Because this dual-enrollment process does not provide any substantial benefit to the participating parochial schools or directly fund activities of a religious nature, we hold that it does not violate Section 6, and we affirm the judgment of the trial court.

In granting summary judgment for the State, the trial court made extensive findings of fact and conclusions of law and concluded both that the plaintiffs/taxpayers did not have standing to bring their claim and that, even if they had standing, the challenged practice does not violate Section 6. Affirming solely on grounds of lack of standing, the Court of Appeals did not address the constitutional claim. *Embry v. O'Bannon*, 770 N.E.2d 943 (Ind.Ct. App.2002). The plaintiffs petitioned for transfer.

Under Indiana Code § 21-3-4.5-1, a portion of the public funding allocated to each Indiana public school corporation is directly proportional to that corporation's "average daily membership" or "ADM." Students enrolled in private schools may be counted in a public school corporation's ADM if the student also: 1) enrolls in the public school, 2) has legal settlement in the

school corporation, and 3) receives instructional services from the school corporation. Ind.Code § 21–3–1.6–1.2. The Indiana Department of Education issued memoranda to all public school superintendents in 1993, 1997, and 1999 advising that it interpreted Indiana Code § 21–3–1.6–1.1 to allow nonpublic school students enrolled in at least one specific class in the public school corporation to be counted in the corporation's ADM.[1] Thereafter, many public school corporations entered into dual-enrollment agreements with private schools in which the public schools agreed to provide various secular instructional services to private school students, on the premises of the private school, in return for securing those students' enrollment in their respective public school corporations. Among the courses offered to the dual-enrolled students are fitness and health, art, foreign language, study skills, verbal skills, music, and computer technology (including internet services).

The two plaintiffs from Lawrence Township in Marion County allege that their township school corporation previously had a dual-enrollment agreement with two parochial schools. While these agreements no longer exist, the plaintiffs object to the continued use of state funds to benefit parochial schools in townships currently operating under similar dual-enrollment agreements. The plaintiff from the city of Mishawaka pays sales tax and local taxes and objects to an ongoing dual-enrollment arrangement between the School City of Mishawaka and a number of Roman Catholic parochial schools, specifically, "the use of state funds to pay public school teachers to teach parochial school students." Br. of Appellants at 9. The fourth plaintiff, a

taxpayer in the city of Madison, objected to an arrangement in effect at the time of the filing of this action between the Madison Community Schools and the Prince of Peace Catholic Schools to provide computer equipment, internet services, and teachers. Although the Madison arrangement has since been discontinued, this plaintiff continues to object to the use of state funds to benefit parochial schools under dual-enrollment agreements still in effect. *Id.* Collectively, the plaintiffs claim that the expanded curriculum and internet access made available for use by parochial school students and paid for with public funds under these dual-enrollment agreements violate Article 1, Section 6, of the Indiana Constitution. They assert no federal constitutional claims.

■ When reviewing a grant or denial of summary judgment, our standard of review is the same as that used in the trial court: summary judgment is appropriate only where the evidence shows there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Tankersley v. Parkview Hosp., Inc.,* 791 N.E.2d 201, 203 (Ind.2003). Where the dispute is one of law rather than fact, our standard of review is de novo. *Freidline v. Shelby Ins. Co.,* 774 N.E.2d 37, 39 (Ind. 2002); *see also LCEOC, Inc. v. Greer,* 735 N.E.2d 206, 208 (Ind.2000). The issues presented in this appeal are issues of law, not fact, and will be reviewed accordingly.

### 1. Standing

■ Because of their status as taxpayers challenging the use of public money in alleged violation of the Indiana Constitution, the plaintiffs claim standing under

---

1. Subsequent to the filing of this lawsuit the ADM statute was amended to provide that dual-enrolled students may be counted for ADM purposes only in proportion to the amount of time they are actually instructed by public school teachers. Ind.Code § 21–3–1.6–1.2 (Supp.2002).

Indiana's public standing doctrine, an exception to the general requirement that a plaintiff must have an interest in the outcome of the litigation different from that of the general public. *State ex rel. Cittadine v. Indiana Dep't of Trans.*, 790 N.E.2d 978, 980 (Ind.2003); *Schloss v. City Indianapolis*, 553 N.E.2d 1204, 1206 n. 3 (Ind. 1990); *Higgins v. Hale*, 476 N.E.2d 95, 101 (Ind.1985). Both the trial court and the Court of Appeals concluded that the plaintiffs lack standing to bring this action, in reliance on *Pence v. State*, 652 N.E.2d 486 (Ind.1995).

As we recently held in *Cittadine*, however, "*Pence* did not alter the public standing doctrine," 790 N.E.2d at 983, which has been recognized in Indiana case law for more than one hundred and fifty years and remains viable today. *Id.* at 980, 983. Because the plaintiffs' complaint is not grounded on a claim of private rights, but rather on their shared public interest as taxpayers in the allegedly unconstitutional expenditure of public funds, they fall within the public standing exception to the general standing requirement, and are entitled to bring this action. This result is also consistent with *State ex rel. Johnson v. Boyd*, 217 Ind. 348, 28 N.E.2d 256 (1940), in which this Court addressed the claims of taxpayers challenging certain acts of the School City of Vincennes as violative of Article I, § 6.

### 2. Article 1 § 6

The plaintiffs challenge the dual-enrollment process, claiming that it results in money being drawn from the state treasury to benefit parochial schools. They argue that this violates the plain meaning of Section 6, and that their position is consistent with the history of the times surrounding the adoption of our 1851 constitution and with the limited case law interpreting Section 6.

Our standard of review of state constitutional claims is well established. It requires:

a search for the common understanding of both those who framed it and those who ratified it. Furthermore, the intent of the framers of the Constitution is paramount in determining the meaning of a provision. In order to give life to their intended meaning, we examine the language of the text in the context of the history surrounding its drafting and ratification, the purpose and structure of our constitution, and case law interpreting the specific provisions. In construing the constitution, we look to the history of the times, and examine the state of things existing when the constitution or any part thereof was framed and adopted, to ascertain the old law, the mischief, and the remedy. The language of each provision of the Constitution must be treated with particular deference, as though every word had been hammered into place.

*City Chapel Evangelical Free Inc. v. City of South Bend*, 744 N.E.2d 443, 447 (Ind. 2001).

The text of Section 6 is brief: "No money shall be drawn from the treasury, for the benefit of any religious or theological institution." Ind. Const. art. I, § 6. This language did not appear in Indiana's 1816 constitution,[2] but was a product of the

---

**2.** The provisions regarding religious freedom in the 1816 constitution are contained in Article 1, Section 3, as follows:

That all men have a natural and indefeasible right to worship Almighty God, according to the dictates of their own consciences:

That no man shall be compelled to attend, erect, or support any place of Worship, or to maintain any ministry against his consent: That no human authority can, in any case whatever, control or interfere with the rights of conscience: And that no prefer-

1850–51 constitutional convention and was included in our constitution of 1851 without any substantive discussion at the convention.

The various religious clauses now contained in Sections 2 through 7 of Article 1 were introduced together at the convention as Resolution Number 11, sections 2 and 3, in a report of the "committee on the rights and privileges of the inhabitants of this State" by the committee's chair, delegate Robert Dale Owen, on October 31, 1850. *Journal of the Convention of the People of the State of Indiana* at 165 (reprint 1936) (1851). The sections reported were ordered to a second reading. *Id.* at 166. Resolution Number 11 underwent its second reading on December 4, 1850, during which minor changes were made in wording and arrangement, none of which altered the language of what is now Section 6. *Id.* at 349–50. The resolution was passed without discussion on third reading on December 5, 1850, by a vote of 122–0, and was referred to the committee on revision, arrangement and phraseology, *id.* at 352, where it emerged on February 1, 1851 in its present form and location as Section 6 of Article 1. *Id.* at 871.

Although there is no recorded discussion surrounding the consideration and adoption of Section 6, the framers' intentions are evidenced in the address by delegate Owen prepared at the conclusion of the convention for the purpose of informing the people of Indiana regarding the changes proposed in the revised constitution and aiding in securing its adoption:

> In addition to the guarantees which find a place in the old Constitution, to secure the rights of conscience and prevent the imposition, on the citizen, of any tax to support any ministry or mode of worship against his consent, it is provided, that no person shall be rendered incompetent as a witness, in consequence of his opinions in matters of religion; and that no money shall be drawn from the treasury for the benefit of any religious or theological institution. Both these provisions are found in the Constitutions of Michigan, Wisconsin, and others of recent date.

*Id.* at 964. The delegates formally approved the address on February 8, 1851. *Id.* at 972.

The framers' purpose to "prevent the imposition, on the citizen, of any tax to support any ministry or mode of worship against his consent" does not expressly include or make any reference to educational institutions with religious affiliations. There is evidence that the noun "ministry," aside from its secular meanings, was understood at the time to mean "[e]cclesiastical function or profession; agency or service of a minister of the gospel or clergymen in the modern church, or priests, apostles, and evangelists in the ancient." Noah Webster, *An American Dictionary of the English Language* 716 (1856). This may suggest that the framers intended Section 6 to prohibit public funds only for ecclesiastical functions.

This interpretation may also be bolstered by comparing the language of Section 6 to its counterparts in the Michigan and Wisconsin constitutions identified by delegate Owen as its sources. Michigan's first state constitution provided that "[n]o money shall be drawn from the treasury for the benefit of religious societies, *or theological or religious seminaries.*" Mich. Const. of 1835, art. I, § 5 (emphasis added).[3] Wisconsin's 1848 Constitution

---

ence shall ever be given by law to any religious societies, or modes of worship;

and no religious test shall be required as a qualification to any office of trust or profit.

**3.** Shortly after October 31, 1850, when the

similarly states, in part, "nor shall any money be drawn from the treasury for the benefit of religious societies, *or religious or theological seminaries.*" Wis. Const. art. I, § 18 (emphasis added).[4] Thus the choice by the framers of Indiana's Section 6 to exclude the phrase "or religious or theological seminaries" may indicate that they did not intend it to apply to religious schools.

During the period of Indiana history after statehood in 1816, education developed slowly. Our 1816 constitution declared, "[i]t shall be the duty of the General Assembly, *as soon as circumstances will permit,* to provide, by law, for a general system of education," Ind. Const. of 1816, art. IX, § 2 (emphasis added), but no tax support was mandated. Donald F. Carmony, *Indiana, 1816–1850: The Pioneer Era* 363 (Indiana Historical Bureau & Indiana Historical Society 1998). To the extent that elementary school education existed before the early 1830s, it was substantially provided by the family or by religious or private schools. *Id.* at 368. Similarly, "[f]rom statehood until 1850 secondary education was mainly at seminaries and academies or at similar institutions with various names" and "conducted principally under private or religious auspices." *Id.* at 394. Because the distinction between public and private schools was so unclear, the meager public funds available for education were often distributed to public and independent schools alike, including those run by churches. Carl F. Kaestle, *Pillars of the Republic: Common Schools and American Society, 1780–1860,* at 166–67 (Hill and Wang 1983). By 1845–50, it is estimated that "less than half of the youth between ages five and twenty-one attended such schools for as much as three months in a year" and "[n]umerous of these schools were private or denominational schools, recognized and in part financed from taxes and proceeds from public school funds." Carmony, *supra,* at 393.

During this same period, however, significant efforts were underway to change Indiana's education practices. Special educational conventions were held in 1837, 1839, 1847, and 1848. *Id.* at 378, 390. In an August 1848 statewide referendum of 140,410 voters, 56% favored, and 44% opposed, a system of free common schools throughout the state supported by taxation. *See id.* at 391. Caleb Mills, an ordained Presbyterian minister and one of the key founders of, and a professor at, Wabash College, was the preeminent advo-

---

language of Section 6 was proposed to the delegates at our constitutional convention, Michigan adopted a new constitution in which this language was replaced with: "No money shall be appropriated or drawn from the treasury for the benefit of any religious sect or society, theological or religious seminary, nor shall property belonging to the state be appropriated for any such purposes." Mich. Const. ratified Nov. 5, 1850, art. IV, § 40.

4. According to one Indiana historian, the course of study in "seminaries" at the time was similar to that of high schools today. Logan Esarey, *History of Indiana* 108 (Harcourt, Brace and Company, Inc.1921). Another source, however, reports that seminaries provided both elementary and secondary instruction in most counties. Richard Gause Boone, *History of Education in Indiana* 49 (Indiana Historical Bureau 1941) (1892). The 1856 dictionary defined the term "seminary" as "[a] place of education; any school, academy, college, or university, in which young persons are instructed in the several branches of learning which may qualify them for their future employments." Webster, *supra,* at 1005. In contrast, it described "primary school," as a school for instructing children in the first rudiments of language and literature, and explains that it was also called a "common school," because "it is open to the children of all the inhabitants of a town or district." *Id.* at 988.

cate of education system improvement in Indiana in the mid 1800s. Charles W. Moores, *Caleb Mills and the Indiana School System* 373 (Wood–Weaver Printing Co.1905). He presented a series of six addresses to the General Assembly highlighting the existing illiteracy in the state; urging a statewide system of free public schools and new forms of raising revenue for public education; securing and adequately compensating better teachers; providing standard textbooks; increasing the number of schools and improving school facilities; and creating a state superintendent to direct the school system.[5] *Id.* at 369–70. In four letters to the members of the constitutional convention, Mills also presented many of his views regarding education. *See id.* at 550–77. Public education did receive considerable attention at the 1850–51 constitutional convention,[6] which was reflected in its adoption of Article 8 establishing and providing funding for a common school system and creating the position of State Superintendent of Public Instruction. However, we find nothing in the convention debates associated with Article 8 that illuminates our analysis of the delegates' intentions as to Section 6 of Article 1.

While Caleb Mills was focusing Indiana's legislative and constitutional leaders upon the need for a system of free public schools and methods of financing the system, the "common school movement" launched in the 1830s by vocal activists in the eastern states appears to have been advancing a wider agenda. As a large number non-Protestants immigrated in the 1820s and 1830s, fears that the growth of the Catholic population would threaten the nation's future unity led many to advocate a school system that would "teach common values," "combat the bad examples of parents," "spread republican values," and "secure social stability." Diane Ravitch, *American Traditions of Education, in A Primer on America's Schools* 8–9 (Terry M. Moe ed., Hoover Institution Press 2001). One of the arguments frequently advanced in favor of common schools was that "the increase of foreign immigration ... is a menace to our free institutions, and that these new elements can be best assimilated in a system of publicly supported and publicly directed common schools." Ellwood Patterson Cubberly, *Public Education in the United States: A Study and Interpretation of American Educational History* 165–66 (Houghton Mifflin Co.1934) (1919). The leaders of the movement were predominantly native-born Protestants who had "no qualms about supporting a common-school policy that was openly Christian, avowedly nonsectarian, and implicitly Protestant." Kaestle, *supra*, at 98. Historian Lloyd P. Jorgenson presents evidence in his study *The State and the Non–Public School, 1825–1925* that many of the common school movement leaders were "among the most vitriolic anti-Romanists of their time." *Id.* at 33 (University of Missouri Press 1987). He writes: "There was no mistaking the

---

5. Although Caleb Mills did favor discontinuing public funds for private schools, his reasons related strictly to the effective use of scarce public resources, *see* Moores, *supra*, at 618, and not to the elimination of Christian religion, which he advocated be emphasized in "every school-room, college, and legislative hall in our land," *id.* at 432. In his Second Address to the legislature, Mills declared: "The Bible is too deeply enthroned in the hearts of the people, to be excluded from our common schools, and other institutions of learning." *Id.* at 459.

6. Among the delegates to the convention were Daniel Read, a professor at Indiana University, and John I. Morrison, a principal of a school at Salam and "one of the ablest teachers the State has ever had." *Id.* at 391. Morrison was Chairman of the Committee on Education at the convention.

motivation behind these campaigns; the leaders openly and boastfully made anti-Catholicism the dominant theme of their attacks." *Id.* at 69.

With respect to Indiana, however, although the framers and ratifiers presumably were apprised of these developments in other states, it appears that such biases may not have significantly motivated the Indiana education reform movement during the period before the 1850–51 constitutional convention. By 1850, less than six percent of Indiana's inhabitants were immigrants.[7] *See* Tyler Gregory Anbinder, *Nativism and Slavery: The Northern Know Nothings and the Politics of the 1850s,* at 71 n. 57 (Oxford University Press 1992). It was after 1850 that Indiana experienced a rapid growth of the Roman Catholic and immigrant populations. L.C. Rudolph, *Hoosier Faiths: A History of Indiana's Churches and Religious Groups* 29 (Indiana University Press 1995). Although the forces most openly advocating anti-immigrant and anti-Catholic positions, the "Nativism" movement and the Know–Nothing Party, flourished in the East in the late 1840s, these forces did not become politically significant in Indiana until the years following the adoption of the 1851 constitution. Emma Lou Thornbrough, *Indiana in the Civil War Era: 1850–1880,* at 60–61 (1966). Informed by history and by the recorded dialogue among the delegates at the constitutional convention, it appears that anti-Catholic and anti-immigrant biases may not have significantly influenced Indiana's 1851 constitution.

Because the present case may be determined on another basis, we need not here decide the issue of whether the framers and ratifiers intended Section 6 to apply to religious schools. The determinative issue is whether the dual enrollment process challenged by the plaintiffs confers substantial benefits upon the participating parochial schools or directly funds activities of a religious nature. Neither the text of Section 6 nor the circumstances surrounding its adoption, as outlined above, provide guidance as to whether the phrase "for the benefit of" in Section 6 was intended to erect an absolute prohibition against any expenditure of public money that might confer merely pecuniary incidental benefit to a religious institution. Upon the issue of incidental benefits, we find guidance in prior Indiana case law. As observed by the plaintiffs, there are only two appellate decisions that involve Section 6.

In *State ex rel. Johnson v. Boyd,* 217 Ind. 348, 28 N.E.2d 256 (1940), this Court permitted the public school system in Vincennes to serve approximately 800 school children who had previously been attending Roman Catholic parochial schools prior to their closure by church authorities, by conducting public schools in the same parochial school buildings, and by employing as staff for the schools the "Sisters and Brothers [of] various Catholic orders." *Id.* at 358, 28 N.E.2d at 261. The Court focused on the total control of the schools by the public school system and found that they were no longer parochial schools. It observed, "[w]e see no valid reason why the said school trustees should not have leased the buildings and equipment furnished by the church authorities" and noted with approval cases from other jurisdictions that permitted religious buildings or facilities to be rented or used for the purpose of conducting public schools. *Id.* at 368, 28 N.E.2d at 265. Noting that the teachers, while members of religious orders, were nevertheless properly licensed,

---

7. We note, however, that at the conclusion of the 1850–51 convention, 5,000 copies of the proposed constitution were ordered printed in German for distribution to voters before the ratification election. *Journal, supra,* at 995.

taught the course of education prescribed by the State Board of Education, and provided no sectarian instruction in the schools during school hours, the Court held that their salaries did not violate Section 6 as benefits for religious or theological institutions. *Id.* at 372–73, 28 N.E.2d at 266–67.

In *Center Township of Marion County v. Coe,* 572 N.E.2d 1350 (Ind.Ct.App.1991), the Trustee of Center Township provided emergency shelter assistance to the homeless under Indiana Code § 12–2–1–6 by entering into agreements with private religious mission shelters whereby the township paid the missions to feed and shelter a number of the township's homeless. The missions required attendance at religious services as a condition of receiving services, and some homeless persons complained that they were forced to attend the services against their will because no other shelters were available. In the resulting class action, the Court held that Section 6 was not offended by the mere fact that benefits accrued to the religious missions under the agreements, but ruled for the plaintiff class because the agreements themselves unconstitutionally conditioned access to publicly funded shelter on attendance at religious services:

> [W]e must conclude that the Trustee's use of the missions under these circumstances does violate the Appellees' constitutional rights. The trial court's order does not, however, prohibit the use of religious missions as vendors of shelter services if the missions do not condition the receipt of shelter on attendance at religious services. As long as the missions provide the statutorily mandated benefit in a manner which does not infringe the Appellees' constitutional rights, the use of missions to provide

shelter services is within the broad discretion of the Trustee.

*Id.* at 1360.

A similar approach has been taken in those states after which Article I § 6 was modeled Wisconsin and Michigan. In *State ex rel. Warren v. Nusbaum,* 55 Wis.2d 316, 198 N.W.2d 650 (Wis.1972), the plaintiffs alleged that a statute authorizing the state to contract with a church-related university for the purchase of dental education services violated the Wisconsin Constitution's prohibition against using public funds "for the benefit of religious societies, or religious or theological seminaries." Wis. Const. art. I, § 18. The Wisconsin Supreme Court stated that:

> "*For the benefit of*" *is not to be read as requiring that some shadow of incidental benefit to a church-related institution brings a state grant or contract to purchase within the prohibition of the section.* This court has held that "... we cannot read sec. 18 (of Art. 1, Wisconsin Constitution) as being so prohibitive as not to encompass the primary-effect test...." The applicability of the primary-effect test is to make "the crucial question ... not whether some benefit accrues to a religious institution as a consequence of the legislative program, but whether its principal or primary effect advances religion." It is the primary effect of monies going from the state treasury to a religious society or church-related institution that determines if such payment is "for the benefit of" such society.... Payments under a proper contract for providing dental education by a church-related university need not be payments "for the benefit of" a religious society or such church-related institution but can be payments for the advancement of the dental health of the citizens of this state. Art. 1, sec. 18 of the state constitution would not be

violated by a proper statute, a proper contract, or payments made pursuant to such contract and statute.

*Id.* at 659 (emphasis added and footnotes omitted). In a later Wisconsin case of the same name, *State ex rel. Warren v. Nusbaum,* 64 Wis.2d 314, 219 N.W.2d 577 (Wis. 1974), the Wisconsin Supreme Court upheld the constitutionality of a state statute authorizing school boards to contract with private educational services to provide educational benefits to children with exceptional needs if such needs could not be met by the state. The Court noted: "[t]he primary effect of [the statute] is not the advancement of a religious organization but the providing of special educational services to the handicapped children of Wisconsin, a secular purpose. Some incidental benefit may accrue to a religious organization . . . ." *Id.* at 585.

In *Advisory Opinion re Constitutionality of P.A.1970, No. 100,* 384 Mich. 82, 180 N.W.2d 265 (1970) the Michigan legislature requested an opinion from the Michigan Supreme Court on the constitutionality of a state statute authorizing public school teachers, paid with public funds, to teach secular subjects in private schools "to foster, improve and advance the quality of secular education, wherever offered, as an integral element of the public welfare." *Id.* at 270. In finding the statute constitutional, the court said:

"[I]ncidental benefits" to religious sects or societies do not invalidate an otherwise constitutional statutory program plainly intended and formulated to serve a public purpose. The same rule must apply to our interpretation of the third sentence of art. 1, § 4. To adopt a strict "no benefits, primary or incidental" rule would render religious places of worship and schools completely ineligible for all State services. There is no evidence, furnished or imaginable, that the people

intended such a rule when they adopted this provision of the Constitution. Furthermore, a strict "no benefits" rule might result in direct conflict with the final sentence of art. 1, § 4, which guarantees that no person shall have his rights, privileges and capacities diminished or enlarged on account of religious beliefs.

*Id.* at 274.

Similarly, in *Dept. of Natural Resources v. Bd. of Trustees of Westminster Church of Detroit,* 114 Mich.App. 99, 318 N.W.2d 830 (1982), the Michigan Court of Appeals upheld the validity of a 50–year lease entered into in 1925 by the Department of Conservation (lessor) and the Board of Trustees of Westminster Church of Detroit (lessee). The plaintiffs claimed that the lease benefited the church in violation of Article 2 § 3 of the 1908 Michigan Constitution, which read, "No money shall be appropriated or drawn from the treasury for the benefit of any religious sect or society, theological or religious seminary; nor shall property belonging to the state be appropriated for any such purpose." The court stated that, "[w]hile the constitution forbids the state from appropriating property for a religious purpose, it does not prohibit the state from contracting to lease property to a religious organization for valid consideration." *Id.* at 832.

The interpretations by Michigan and Wisconsin of their state constitutional counterparts to our Section 6, permitting incidental state benefits to religious institutions, are consistent with this Court's decisions in *Boyd* and *Coe* described above.

 While acknowledging that dual-enrollment programs do not provide any payment of public funds directly to religious institutions, the plaintiffs urge that the dual-enrollment agreements provide specific benefits to parochial schools because they make it unnecessary for the

schools to hire and pay as many teachers, and because the schools may use the resources thus saved to expand curriculum and attract students. It is not disputed, however, that the dual-enrollment programs provide obvious significant educational benefits to the Indiana children for whom participation in a dual-enrollment program affords educational resources and training in subjects they would not otherwise receive. The programs likewise benefit the State by furthering its objective to encourage education for all Indiana students. In addition, the public school systems providing instructional services under a dual-enrollment plan benefit from increased public funding. Compared with the substantial educational benefits to children, the increased attainment of the State's objectives, and the additional funds made available to participating public school systems, we find any alleged "savings" to parochial schools and their resulting opportunities for curriculum expansion would be, at best, relatively minor and incidental benefits of the dual-enrollment programs.

In summary, while the text of Article 1, Section 6, in the context of history may be helpful in discerning whether its framers and ratifiers specifically intended it to apply to the funding of religious schools, the text and its historical context do not inform us whether the framers intended to prohibit all public funds from providing merely incidental benefits to religious and theological institutions. Indiana case law, however, has interpreted Section 6 to permit the State to contract with religious institutions for goods or services, notwithstanding possible incidental benefit to the institutions, and to prohibit the use of public funds only when directly used for such institutions' activities of a religious nature. Because the dual-enrollment programs permitted in Indiana do not confer sub-

stantial benefits upon any religious or theological institution, nor directly fund activities of a religious nature, such dual-enrollment programs do not violate Section 6.

### Conclusion

Transfer is granted. Although we reverse the trial court's conclusion that the plaintiffs lack standing to bring the instant action, we affirm its conclusion that dual-enrollment programs do not violate Article 1, Section 6, of the Indiana Constitution. Summary judgment is therefore affirmed.

RUCKER, J., concurs. SHEPARD, C.J., concurs in result. SULLIVAN, J., concurs in part 1 and concurs in result in part 2, with separate opinion which SHEPARD C.J. joins. BOEHM, J., concurs in result, with separate opinion, in which SULLIVAN, J. concurs.

SULLIVAN, Justice, concurring in part 1.

I concur in part 1 of the Court's opinion but write separately to give more detailed attention to the question on which the Court of Appeals resolved this case—the question of the taxpayer-plaintiffs' standing to bring this lawsuit.

The majority cites our recent decision in *State ex rel. Cittadine v. Indiana Dep't of Transp.*, 790 N.E.2d 978 (Ind.2003), as authority for the taxpayer-plaintiffs' standing here. Some further discussion of *Cittadine* is useful to make clear that *Cittadine*, consistent with prior law, confers taxpayer standing in constitutional cases only in limited circumstances.

*Cittadine* was not a constitutional case. That is, there was no unconstitutional expenditure of public funds alleged in that case. *Cittadine* did discuss our opinion in *Pence v. State*, 652 N.E.2d 486 (Ind.1995), the principal authority relied on by the

Court of Appeals in this case. In that discussion, we unanimously held that the public standing doctrine permits claims that government action is unconstitutional but, because "[s]tanding is a key component in maintaining our state constitutional scheme of separation of powers," *Pence*, 652 N.E.2d at 488, the " 'availability of taxpayer or citizen standing' " is limited to " '*extreme circumstances*,' " *Cittadine*, 790 N.E.2d at 983 (quoting *Pence*, 652 N.E.2d at 488) (emphasis in *Cittadine*).

Today's opinion deals with one such extreme circumstance—a challenge brought under Article I, § 6, of the Indiana Constitution which imposes an explicit limitation on the expenditure of state funds for the benefit of religious or theological institutions.

*Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), provides a useful analogy. In *Flast*, the Supreme Court held that federal taxpayers had standing to challenge the expenditure of federal funds for teaching some subjects in and purchasing instructional materials for religious schools as a violation of the Establishment Clause of the First Amendment. In doing so, the Court created an exception to the general rule stated in *Frothingham v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), that a litigant does not have standing when the sole basis for standing is that litigant's status as a federal taxpayer. The Court explained that standing is about "whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.' " *Flast*, 392 U.S. at 99, 88 S.Ct. 1942 (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). Because taxpayers may have the requisite interest in certain circumstances, the Court found that there was "no absolute bar in Article III to suits by federal taxpayers challenging allegedly unconstitutional federal taxing and spending programs." *Id.* at 101, 88 S.Ct. 1942.

The crux of the standing question, the Court said, rests on the "nexus between the status asserted by the litigant and the claim he presents." *Id.* at 102, 88 S.Ct. 1942. For federal taxpayers, the necessary nexus requires both that the violation and the "precise nature of the constitutional infringement alleged" relate to one's status as a taxpayer. *Id.* Essentially, "the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. 1, § 8." *Id.* at 102–03, 88 S.Ct. 1942. The taxpayers in *Flast* showed just that, as they challenged Congress's expenditure of funds as a violation of the Establishment Clause, which places a specific limit on Congress's taxing and spending power.

Although *Flast* does not control this case, its reasoning applies here. As in *Flast*, the taxpayer-plaintiffs assert a violation of an explicit limit on the General Assembly's ability to draw funds from the treasury. They challenge the power of the General Assembly to spend public funds on the dual-enrollment process because the expenditures allegedly violate Article I, § 6, of the Indiana Constitution: "No money shall be drawn from the treasury, for the benefit of any religious or theological institution." This is not a case in which a party challenges government action as exceeding its power where no clear limit is placed on that power. These taxpayers have a concrete interest in having taxpayer funds spent in a manner consistent with

the explicit limit imposed on the General Assembly's spending power by Art. I, § 6.

We unanimously made clear in *Cittadine* that we "exercise . . . judicial discretion with cautious restraint under the circumstances" in deciding constitutional claims so as not to overstep the constitutional limitations on the judiciary's authority. 790 N.E.2d at 983. Because there is an explicit constitutional provision that restrains the Legislature in this case, the Court does not overstep these limitations in deciding this challenge.

SHEPARD, C.J., joins.

BOEHM, J., concurring in result.

I agree with the majority in the portion of its opinion concluding that plaintiffs have standing to assert their claims. I also agree with the majority that expenditure of public funds for proper educational purposes is not "for the benefit of" a religious institution even if the delivery point of the educational services is a parochial school. Based on these two points, I concur in the result reached by the majority.

I part company with the majority insofar as it concludes or implies that Article I, Section 6 of the Indiana Constitution has nothing to say about funding for parochial schools. That section provides in rather clear language that "No money shall be drawn from the public treasury for the benefit of any religious or theological institution." Even if we accept the meager historical evidence that animus towards Catholics was not part of the thinking of the delegates to the 1851 Indiana constitutional convention, it seems quite a stretch to conclude that a parochial school is not a "religious institution" within the meaning of that constitutional provision. No one claims that the church-affiliated schools involved in this litigation provide a purely sectarian curriculum. Rather, although they raise their pupils in different faiths, each of these schools teaches its own single religious or theological doctrine as creed. That in my view plainly renders each of them a "religious institution."

There is nothing wrong with this, of course. Indeed, other provisions of the Indiana Constitution affirm the rights of religious groups that I think surely include the right to operate their own schools. Similarly, in Article VIII, the constitution provides for public support for public education. Thus, as the trial court pointed out, public support for education of parochial pupils in subjects not offered by parochial schools seems perfectly appropriate to me.

It is an entirely different question, however, whether all citizens of the state can be compelled to pay for religious education with tax dollars. The Indiana Constitution answers that in the negative. Article 1, Section 6 specifically prohibits public expenditures for "religious institutions." Schools of every denomination and faith are surely among these "institutions" and the only issue is whether a particular expenditure is "for the benefit" of the school. The majority reaches its conclusion that parochial schools may not be religious institutions by pointing to three items of historical interest: 1) one respected member of the 1851 convention, Robert Owen, described the Indiana provision as "found in" the then-recently adopted constitutions of Michigan and Wisconsin; 2) Michigan and Wisconsin prohibit expenditures for "religious seminaries"; 3) as understood in the mid 19th Century, a "seminary" was a school of any type, whether or not religiously affiliated. From these propositions, the majority concludes that Indiana's founders, by prohibiting funding of religious "institutions," intended to remove religious schools from the list of prohibited beneficiaries of public largesse. I reach

the opposite conclusion. One obvious inference from these facts is that we should take Robert Owen at his word. If the Indiana provision is "found in" other earlier constitutions which barred funding of religious schools (described as "seminaries" by our sister states), it follows that parochial schools, Catholic or otherwise, were precisely the target of Article I, Section 6. And to the extent there is significance in the selection of "institutions" rather than "seminaries," I would think that difference in language supports the conclusion that the 1851 Constitution intended to expand, not contract, the type of religious entities for which public expenditure is prohibited. Surely a school or seminary is one form of "institution" as the term was and is commonly understood.

To the extent the majority finds Michigan and Wisconsin authority significant, I submit that these states both assume that a parochial school is a "religious institution" and resolve the issue before them solely on the question of whether an expenditure is "for the benefit" of the institution. On that issue, both states focus on whether legislation has the primary effect of advancing religion, and whether the legislature designed the legislation to benefit a parochial school. Leading cases from both states assume they are addressing a "religious institution" when dealing with parochial schools and proceed to the "for the benefit of" analysis. For example, in *Advisory Opinion re Constitutionality of P.A.1970, No. 100,* 384 Mich. 82, 180 N.W.2d 265 (1970), relied on by the majority, the Michigan Supreme Court focused on the legislative purpose of the act in question and the primary effect of the legislation, noting that incidental benefits accrued do not, by themselves, invalidate a legislative enactment. *Id.* at 270, 274. In *Jackson v. Benson,* 218 Wis.2d 835, 578 N.W.2d 602 (Wis.1998), the Wisconsin Supreme Court specifically identified the case

as turning on whether or not the legislation's primary purpose was "for the benefit of" a religious institution, not whether the parochial school was a "religious seminary" as the term appears in the Wisconsin Constitution, Article 1, Section 18. *Id.* at 621. The Wisconsin Supreme Court was quite specific: "[u]nlike the court of appeals, which focused on whether sectarian private schools were 'religious seminaries' under art. 1, § 18, we focus our inquiry on whether the aid provided by the amended MPCP is 'for the benefit of' such religious institutions." *Id.* In resolving this second issue, the court took an approach similar to the majority's approach to the "for the benefit of" problem: "[t]he crucial question, under art. 1, § 18, as under the Establishment Clause, is not whether some benefit accrues to a religious institution as a consequence of the legislative program, but whether its principal or primary effect advances religion." *Id.* (citations omitted).

In sum, I agree that the legislation involved in this case is constitutional because it does not expend funds for the benefit of a religious institution. But the majority would implicitly leave the door open to public funding of sectarian schools. The Constitution stands squarely against that proposition, and for that reason I respectfully dissent from the portion of the majority opinion addressing the religious institutions issue.

SULLIVAN, J., concurs.