ATTORNEYS FOR APPELLANTS
Andrew W. Hull
Alice M. Morical
Hoover Hull, LLP
Indianapolis, Indiana

John M. West
Joshua B. Shiffrin
Bredhoff & Kaiser, PLLC
Washington, D.C.

Alice O'Brien
Kristen L. Hollar
National Education Association
Washington, D.C.

ATTORNEYS FOR APPELLEES
Gregory F. Zoeller
Attorney General of Indiana

Thomas M. Fisher
Solicitor General

Heather Hagan McVeigh
Ashley Tatman Harwell
Tamara Weaver
Deputy Attorneys General
Indianapolis, Indiana

ATTORNEYS FOR INTERVENOR
APPELLEES
J. Lee McNeely
McNeely Stephenson Thopy &
Harrold
Shelbyville, Indiana

William H. Mellor
Robert W. Gall
Richard D. Komer
Institute for Justice
Arlington, Virginia

ATTORNEYS FOR AMICI CURIAE
[see attachment]



# In the
# Indiana Supreme Court

### No. 49S00-1203-PL-172

FILED
Mar 26 2013, 10:28 am
CLERK
of the supreme court,
court of appeals and
tax court

TERESA MEREDITH, DR. EDWARD E. EILER, RICHARD E. HAMILTON,
SHEILA KENNEDY, REV. MICHAEL JONES, DR. ROBERT M.
STWALLEY III, KAREN J. COMBS, REV. KEVIN ARMSTRONG,
DEBORAH J. PATTERSON, KEITH GAMBILL, AND JUDITH LYNN
FAILER                                                     *Appellants (Plaintiffs),*

v.

MIKE PENCE,* IN HIS OFFICIAL CAPACITY AS GOVERNOR OF INDIANA,
AND GLENDA RITZ,* IN HER OFFICIAL CAPACITY AS INDIANA
SUPERINTENDENT OF PUBLIC INSTRUCTION AND DIRECTOR OF
THE INDIANA DEPARTMENT OF EDUCATION                       *Appellees (Defendants),*
                                   AND
HEATHER COFFY AND MONICA POINDEXTER          *Appellees (Defendant-Intervernors).*

Appeal from the Marion Superior Court, No. 49D07-1107-PL-25402
The Honorable Michael D. Keele, Judge

On Transfer Pursuant to Indiana Appellate Rule 56(A)

**March 26, 2013**

**Dickson, Chief Justice.**

Asserting violation of three provisions of the Indiana Constitution, the plaintiffs challenge Indiana's statutory program for providing vouchers to eligible parents for their use in sending their children to private schools. Finding that the challengers have not satisfied the high burden required to invalidate a statute on constitutional grounds, we affirm the trial court's judgment upholding the constitutionality of the statutory voucher program.

As a preliminary matter, we emphasize that the issues before this Court do not include the public policy merits of the school voucher program. Whether the Indiana program is wise educational or public policy is not a consideration germane to the narrow issues of Indiana constitutional law that are before us. Our individual policy preferences are not relevant. In the absence of a constitutional violation, the desirability and efficacy of school choice are matters to be resolved through the political process.

This is an appeal from a summary judgment denying relief in an action brought by several Indiana taxpayers (collectively "plaintiffs") against the Governor, the Superintendent of Public Instruction, and the Director of the Department of Education of the State of Indiana who were joined by defendant-intervenors, two parents intending to use the program at issue to send their children to private elementary and high schools (collectively "defendants"). The plaintiffs' lawsuit challenges the Choice Scholarship Program, a program enacted by the Indiana General Assembly, Ind. Code §§ 20-51-4-1 to -11, through which "the State provides vouchers called 'choice scholarships' to eligible students to attend private schools instead of the public schools they otherwise would attend." Appellants' Br. at 3. The plaintiffs contend that the school voucher program violates Article 8, Section 1,[1] and Article 1, Sections 4[2] and 6,[3] of the Indiana Consti-

---

[*] Glenda Ritz was one of the original plaintiffs in this action. In the ensuing general election of November 2012, she defeated Tony Bennett, the incumbent Superintendent of Public Instruction, and thus Superintendent Ritz has been substituted for Superintendent Bennett as a defendant-appellee pursuant to Indiana Appellate Rule 17(C)(1) ("When a public officer who is sued in an official capacity dies, resigns or otherwise no longer holds public office, the officer's successor is automatically substituted as a party."). By function of the same rule, Governor Mike Pence was substituted for Governor Mitch Daniels. Following her taking office, Superintendent Ritz moved to withdraw from this appeal as a plaintiff-appellant, which motion we grant.

tution "both because it uses taxpayer funds to pay for the teaching of religion to Indiana school-children and because it purports to provide those children's publicly funded education by paying tuition for them to attend private schools rather than the 'general and uniform system of Common Schools' the Constitution mandates."[4] *Id.* at 12.  At the trial court, the plaintiffs and defendant-intervenors each moved for summary judgment, and the trial court denied the plaintiffs' motion and granted the defendant-intervenors' motion.  The plaintiffs appealed and the defendants filed a verified joint motion to transfer jurisdiction to this Court under Appellate Rule 56(A).[5]  After consideration, we granted the motion and assumed jurisdiction over the case.  For reasons ex-pressed below, we now find that the school voucher program does not violate Article 8, Section 1; Article 1, Section 4; or Article 1, Section 6.  Accordingly, we affirm the judgment of the trial court.

## 1.  Burden of Proof and Standard of Review

---

[1] [Article 8,] Section 1.  Knowledge and learning, generally diffused throughout a community, being essential to the preservation of a free government; it shall be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement; and to pro-vide, by law, for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all.

[2] [Article 1,] Section 4.  No preference shall be given, by law, to any creed, religious society, or mode of worship; and no person shall be compelled to attend, erect, or support, any place of worship, or to maintain any ministry, against his consent.

[3] [Article 1,] Section 6.  No money shall be drawn from the treasury, for the benefit of any reli-gious or theological institution.

[4] As taxpayers challenging allegedly unconstitutional use of public funds, the plaintiffs have standing "under Indiana's public standing doctrine, an exception to the general requirement that a plaintiff must have an interest in the outcome of the litigation different from that of the general public." Embry v. O'Bannon, 798 N.E.2d 157, 159–60 (Ind. 2003) (citing Cittadine v. Ind. Dep't of Transp., 790 N.E.2d 978, 980 (Ind. 2003); Schloss v. City of Indianapolis, 553 N.E.2d 1204, 1206 n.3 (Ind. 1990); Higgins v. Hale, 476 N.E.2d 95, 101 (Ind. 1985)).

[5] Appellate Rule 56(A) provides:

A. Motion Before Consideration by the Court of Appeals.  In rare cases, the Supreme Court may, upon verified motion of a party, accept jurisdiction over an appeal that would otherwise be within the jurisdiction of the Court of Appeals upon a showing that the appeal involves a substan-tial question of law of great public importance and that an emergency exists requiring a speedy determination.  If the Supreme Court grants the motion, it will transfer the case to the Supreme Court, where the case shall proceed as if it had been originally filed there.  If a filing fee has al-ready been paid in the Court of Appeals, no additional filing fee is required.

Ind. Appellate Rule 56(A) (emphasis omitted).

The plaintiffs contend that the voucher-program statute is unconstitutional on its face[6] and thus embrace a heavy burden of proof. "When a party claims that a statute is unconstitutional on its face, the claimant assumes the burden of demonstrating that there are no set of circumstances under which the statute can be constitutionally applied." Baldwin v. Reagan, 715 N.E.2d 332, 337 (Ind. 1999). Moreover, in reviewing the constitutionality of a statute, "every statute stands before us clothed with the presumption of constitutionality unless clearly overcome by a contrary showing." Id. at 338; *see also* State v. Rendleman, 603 N.E.2d 1333, 1334 (Ind. 1992) ("The burden is on the party challenging the constitutionality of the statute, and all doubts are resolved against that party."). Our method of interpreting and applying provisions of the Indiana Constitution is well-established, requiring

> a search for the common understanding of both those who framed it and those who ratified it. Furthermore, the intent of the framers of the Constitution is paramount in determining the meaning of a provision. In order to give life to their intended meaning, we examine the language of the text in the context of the history surrounding its drafting and ratification, the purpose and structure of our constitution, and case law interpreting the specific provisions. In construing the constitution, we look to the history of the times, and examine the state of things existing when the constitution or any part thereof was framed and adopted, to ascertain the old law, the mischief, and the remedy. The language of each provision of the Constitution must be treated with particular deference, as though every word had been hammered into place.

Embry v. O'Bannon, 798 N.E.2d 157, 160 (Ind. 2003) (quoting City Chapel Evangelical Free Inc. v. City of South Bend, 744 N.E.2d 443, 447 (Ind. 2001)); *accord* Nagy v. Evansville-Vanderburgh Sch. Corp., 844 N.E.2d 481, 484 (2006).


"In reviewing an appeal of a motion for summary judgment ruling, we apply the same standard applicable to the trial court." Presbytery of Ohio Valley, Inc. v. OPC, Inc., 973 N.E.2d 1099, 1110 (Ind. 2012) (citing Wilson v. Isaacs, 929 N.E.2d 200, 202 (Ind. 2010)). Review is limited to those facts designated to the trial court, Ind. Trial Rule 56(H), and summary judgment shall be granted where the designated evidence "shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." T.R. 56(C).

---

[6] A "facial challenge" is a claim that a statute, as written (i.e. "on its face"), cannot be constitutionally implemented. *See Black's Law Dictionary* 261 (9th ed. 2009) ("A [facial challenge is a] claim that a statute . . . always operates unconstitutionally."). A statue may also be challenged "as applied," that is, that the "statute is unconstitutional on the facts of a particular case or in its application to a particular party." *Id.*

"All facts and reasonable inferences drawn from those facts are construed in favor of the non-moving party." Mangold ex rel. Mangold v. Ind. Dep't of Natural Res., 756 N.E.2d 970, 973 (Ind. 2001). When faced with competing motions for summary judgment, our analysis is unchanged and "we consider each motion separately construing the facts most favorably to the non-moving party in each instance." Presbytery of Ohio Valley, 973 N.E.2d at 1110 (quoting Sees v. Bank One, Ind., N.A., 839 N.E.2d 154, 160 (Ind. 2005)) (internal quotation marks omitted). The issues presented by the parties' motions are issues of law, not fact, and our review is limited accordingly.

## 2. The Challenged Legislation

The parties' designated evidence reveals the following relevant facts. The school voucher program (denominated by the legislature as the "Choice Scholarship Program") was enacted by the General Assembly in 2011, Pub. L. No. 92-2011, § 10, 2011 Ind. Acts 1024, and permits eligible students to obtain scholarships (also called "vouchers") that may be used toward tuition at participating nonpublic schools in Indiana. *See* Ind. Code § 20-51-1-4.5 (defining "Eligible individual"); *id.* § 20-51-1-4.7 (defining "Eligible school"). To be eligible for the voucher program, a student must live in a "household with an annual income of not more than one hundred fifty percent (150%) of the amount required for the individual to qualify for the federal free or reduced price lunch program." *Id.* § 20-51-1-4.5. The voucher amount is determined from statutorily defined criteria pegged to the federal free or reduced price lunch program with the maximum[7] voucher being "ninety percent (90%) of the state tuition support amount," *id.* § 20-51-4-4,

---

[7] Section 5 of the voucher-program statute specifies the baseline state tuition amount which is the total tuition support for the school corporation in which the eligible student lives (less some specific grants) divided by the average daily membership of the school corporation. Ind. Code § 20-51-4-5. Section 4 specifies how that baseline amount is applied to determine the voucher amount.

> Sec. 4. The maximum amount to which an eligible individual is entitled under this chapter for a school year is equal to the least of the following:
> > (1) The sum of the tuition, transfer tuition, and fees required for enrollment or attendance of the eligible student at the eligible school selected by the eligible individual for a school year that the eligible individual (or the parent of the eligible individual) would otherwise be obligated to pay to the eligible school.
> > (2) An amount equal to:
> > > (A) ninety percent (90%) of the state tuition support amount determined under section 5 of this chapter if the eligible individual is a member of a household with an annual in-

designated for the student in the public "school corporation in which the eligible individual has legal settlement." *Id.* § 20-51-4-5. To be eligible to receive program students, a nonpublic school must meet several criteria, including accreditation from the Indiana State Board of Education ("Board of Education") or other recognized accreditation agency, administration of the Indiana statewide testing for educational progress (ISTEP), and participation in the Board of Education's school improvement program under Indiana Code Section 20-31-8-3. *Id.* § 20-51-1-4.7. Participation in the program does not subject participating schools to "regulation of curriculum content, religious instruction or activities, classroom teaching, teacher and staff hiring requirements, and other activities carried out by the eligible school," *id.* § 20-51-4-1(a)(1), except that the school must meet certain minimum instructional requirements which correspond to the mandatory curriculum in Indiana public schools and nonpublic schools accredited by the Board of Education. *Compare id.* § 20-51-4-1(b) to (h) (providing the instructional requirements for voucher-program schools), *with id.* § 20-30-5-0.5 to -19 (providing the mandatory curriculum for Indiana public schools and nonpublic schools accredited by the Board of Education). The requirements include instruction in Indiana and United States history and government, social studies, language arts, mathematics, sciences, fine arts, and health. *Id.* § 20-51-4-1(b) to (h).

Participation in the school voucher program is entirely voluntary with respect to eligible students and their families. In order to participate, in addition to the eligibility requirements, students and schools must submit an application to the Indiana Department of Education ("Department"). *See* 512 Ind. Admin. Code 4-1-2, -3, *available at* http://www.in.gov/legislative/iac/T05120/A00040.PDF; *see also* Ind. Code § 20-51-4-7 (requiring the Department to adopt rules to implement the voucher program). The fact that a student's family might meet the statutory eligibility qualifications does not require them to participate in the voucher program and to

---

come of not more than the amount required for the individual to qualify for the federal free or reduced price lunch program; and
(B) fifty percent (50%) of the state tuition support amount determined under section 5 of this chapter if the eligible individual is a member of a household with an annual income of not more than one hundred fifty percent (150%) of the amount required for the individual to qualify for the federal free or reduced price lunch program.
(3) If the eligible individual is enrolled in grade 1 through 8, the maximum choice scholarship that the eligible individual may receive for a school year is four thousand five hundred dollars ($4,500).

*Id.* § 20-51-4-4.

select a program-eligible school. The parents of an eligible student are thus free to select any program-eligible school[8] or none at all. The voucher program does not alter the makeup or availability of Indiana public or charter schools. In accepting program students, eligible schools are free to maintain and apply their preexisting admissions standards except that "[a]n eligible school may not discriminate on the basis of race, color, or national origin." Ind. Code § 20-51-4-3(a), (b). The program statute is silent with respect to religion, imposing no religious require-ment or restriction upon student or school eligibility, *see generally id.* § 20-51-4-1 to -11; § 20-51-1-4.5, -4.7, and as of October 2011, most of the schools that had sought and received approv-al from the Department to participate in the voucher program were religiously affiliated, Appel-lants' App'x at 209–14. When a voucher is awarded, the Department distributes the funds, pro-vided that the distribution is endorsed by both the parent[9] and the eligible school. *Id.* § 20-51-4-10; 512 I.A.C. 4-1-4(b). Once distributed, the voucher program places no specific restrictions on the use of the funds.

### 3. Article 8, Section 1

The plaintiffs contend that Article 8, Section 1, by directing the General Assembly "to provide, by law, for a general and uniform system of Common Schools," prohibits the legislature from providing for the education of Indiana schoolchildren by any other means. In this respect, the plaintiffs argue that the specific directive for a system of public schools supersedes the other directive of Article 8, Section 1.

As we have previously stated, Article 8, Section 1 ("Education Clause"), articulates two distinct duties of the General Assembly with respect to education in Indiana.

After its precatory introduction stressing the importance of knowledge and learning to

---

[8] In order to be "eligible," a school must not be "a charter school or the school corporation in which an eligible individual has legal settlement." Ind. Code § 20-51-1-4.7(6). That is, the school must be outside the defined geographical boundary of the student's charter or public school corporation.

[9] To be eligible, students must be between five (5) to twenty-two (22) years of age. Ind. Code § 20-51-1-4.5(2). Thus, some eligible students, having reached the age of majority, may utilize the pro-gram of their own volition. However, common sense suggests that most eligible students will be minors and the actions and decisions regarding their school attendance will be made by their parent(s) or guardi-an(s). For ease of readability, we will thus refer to the decisions of parents and families throughout the remainder of this opinion.

the preservation of a free government, the text of the Education Clause expresses two duties of the General Assembly.  The first is the duty to *encourage* moral, intellectual, scientific, and agricultural improvement.  The second is the duty to *provide* for a general and uniform system of open common schools without tuition.

Bonner ex rel Bonner v. Daniels, 907 N.E.2d 516, 520 (Ind. 2009) (footnote omitted).  We find this evident from the text of the Education Clause, which "is particularly valuable because it 'tells us how the voters who approved the Constitution understood it, whatever the expressed intent of the framers in debates or other clues.'"  *Id.* at 519–20 (quoting McIntosh v. Melroe Co., 729 N.E.2d 972, 983 (Ind. 2000)).  That clause states:

> Knowledge and learning, generally diffused throughout a community, being essential to the preservation of a free government; *it shall be the duty* of the General Assembly *to encourage*, by all suitable means, moral, intellectual, scientific, and agricultural improvement; *and to provide*, by law, for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all.

Ind. Const. art. 8, § 1 (emphasis added).  The framers use of the conjunction "and" plainly suggests that the phrases are separate and distinct.  That is, the Education Clause is logically read in this way: "it shall be the duty of the General Assembly to encourage . . . ; and [it shall be the duty of the General Assembly] to provide . . . ."[10]  *Id.*


This view is reinforced by a comparison of the present language to that used in Indiana's first Constitution from 1816.  The first section of the education provision of the 1816 Constitution ends with the following directive:

> The General Assembly shall from, [sic] time to time, pass such laws as shall be calculated to encourage intellectual, Scientific, and agricultural improvement, by allowing rewards and immunities for the promotion and improvement of arts, sciences, commerce, manufactures, and natural history; and to countenance and encourage the principles of humanity, honesty, industry, and morality.

Ind. Const. of 1816, art. IX, § 1.  This language bears a substantial similarity to the first duty ar-

---

[10] The distinction here was aptly demonstrated by the brief of amicus curiae The Freidman Foundation for Educational Choice, which contended that the plaintiffs would have this Court read the Education Clause to say: "[I]t shall be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement; and to provide [by providing], by law, for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all." *See* Friedman Found. for Educ. Choice Br. at 13.  We note that the framers could have accomplished the same by including other simple language, such as "it shall be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement [in the common schools]; . . . ."  We reject such an expansive reading as inconsistent with the words the framers chose and the people ratified.

8

ticulated in the Education Clause of the 1851 Constitution[11] and clearly expresses that the legislature "*shall . . . pass . . . laws*" to carry out the directive. *Id.* (emphasis added). As we have previously noted, the second duty, the directive to the legislature to establish the system of common schools, was also adapted from the 1816 Constitution. Bonner, 907 N.E.2d at 520–21; Nagy, 844 N.E.2d at 487–88. However, that duty, in its 1816 form, was located in a different section. *See* Ind. Const. of 1816, art. IX, § 2.[12] Additionally, this section contained discretionary language directing the legislature, "*as soon as circumstances will permit*, to provide, by law, for a general system of education." *Id.* (emphasis added); *see also* Nagy, 844 N.E.2d at 488 (discussing the removal of the phrase "as soon as circumstances will permit" from the 1851 education provision). Hence, the first duty ("to encourage") could be fulfilled without simultaneously fulfilling the second duty ("to provide"). Accordingly, the framers and ratifiers of the 1816 Constitution could only have viewed these two duties as separate and distinct imperatives. The use of the conjunction "and" in the 1851 Constitution is a strong indication that this view, separate and distinct duties, was also intended by the framers and ratifiers of the current Education Clause. This distinction suggests that the General Assembly's duty "to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement" is to be carried out *in addition to* provision for the common school system. Though we have observed that this duty is "general and aspirational" and not well suited to judicial enforceability, Bonner, 907 N.E.2d at 520, this by no means lessens the efficacy of the imperative. In fact, broad legislative discretion appears to have been the framers' intent through the inclusion of the phrase "by all suitable means." The method and means of fulfilling this duty is thus delegated to the sound legislative discretion of the General Assembly, and where, as here, the exercise of that discretion does not run afoul of the Constitution, it is not for the judiciary to evaluate the prudence of the chosen policy.

As to the history and purpose of Article 8, we are guided by our previous reviews of the

---

[11] As we noted in Bonner, the precatory language of the 1851 Education Clause also appears to have been adapted from its predecessors. *See* Bonner, 907 N.E.2d at 520 n.4 (noting the similarities in the precatory language of the education provisions in the 1851 and 1816 constitutions and the Northwest Ordinance of 1787).

[12] "It shall be the duty of the General [A]ssembly, as soon as circumstances will permit, to provide, by law, for a general system of education, ascending in a regular gradation, from township schools to a state university, wherein tuition shall be gratis, and equally open to all." Ind. Const. of 1816, art. IX, § 2.

9

topic in Nagy, 844 N.E.2d at 485–89, and Bonner, 907 N.E.2d at 521–22. The history leading up to the 1850–1851 Constitutional Convention and the debates at the Convention itself reveal that the framers sought to establish "a uniform statewide system of public schools that would be supported by taxation." Nagy, 844 N.E.2d at 489; *see also* Martha McCarthy and Ran Zhang, *The Uncertain Promise of Free Public Schooling*, in *The History of Indiana Law* 213, 215 (David J. Bodenhamer and Hon. Randall T. Shepard eds., 2006) ("The [1816] constitutional directive that the General Assembly provide for a general system of education 'as soon as circumstances will permit' was so flexible that there was little significant progress toward providing for such a system."). The General Assembly has carried out this mandate by enacting "a body of law directed at providing a general and uniform system of public schools. It is detailed, comprehensive, and includes among other things provisions for revenue and funding sources, curriculum requirements, and an assortment of special programs and projects." Nagy, 844 N.E.2d at 491 (citing Indiana Code Titles 20 and 21). Under the school voucher program, this public school system remains in place.

The plaintiffs nevertheless contend that by "enacting a program that could divert to private schools as many as 60% of Indiana's schoolchildren . . . the General Assembly has departed from the mandate of a 'general and uniform system of Common Schools.'" Appellants' Br. at 31. However, that a significant number of students *may* be eligible for the voucher program does not mean that there is "no set of circumstances under which the statute can be constitutionally applied." Baldwin, 715 N.E.2d at 337. Even if we were to apply the plaintiffs' 60% hypothesis and assume that the families of all such program-eligible students utilize the program, so long as a "uniform" public school system, "equally open to all" and "without charge," is maintained, the General Assembly has fulfilled the duty imposed by the Education Clause. The plaintiffs proffer no evidence that maximum participation in the voucher program will *necessarily* result in the elimination of the Indiana public school system.[13] The school voucher program does not replace the public school system, which remains in place and available to all Indiana schoolchildren in

_____

[13] The plaintiffs' contention appears to be founded, in part, upon the fact that the funding of an individual public school will be reduced commensurate to the number of voucher-program students withdrawing to attend other schools. However, this is equally so when a student transfers to another public or charter school, withdraws to attend a private school using personal funds, or withdraws to homeschool. *See* Ind. Code §§ 20-43-4-1 to -8 (providing the criteria for determining enrollment and calculation of the Average Daily Membership for public schools for purposes of determining tuition support).

accordance with the dictates of the Education Clause.

In challenging the voucher program under Article 8, Section 1, the plaintiffs rely heavily on the Florida Supreme Court's decision in Bush v. Holmes, 919 So. 2d 392 (Fla. 2006), in which the court found that the Florida Opportunity Scholarship Program, a program similar to Indiana's school voucher program, violated Article IX, Section 1(a), of the Florida Constitution.[14] *Id.* at 412. In its textual analysis of the constitutional provision at issue, the court focused on the second and third sentences of section 1(a), reading them *in pari materia*.[15] *Id.* at 406–07. The court found that the second sentence, which states that it is the "paramount duty of the state to make adequate provision for the education of all children residing within its borders," expressed a mandate to the legislature to provide education for Florida schoolchildren, while the third sentence, "[a]dequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education," represented a restriction on the execution of that mandate by defining what was meant by "adequate provision." *Id.* at 407. The court therefore held that the Florida program violated section 1(a) by "devoting the state's resources to the education of children within [Florida] through means other than a system of free public schools." *Id.*

The Florida Supreme Court distinguished its education article from the education article found in the Wisconsin Constitution, under which a similar challenge to a similar program had been brought. *See id.* at 407 n.10. The Wisconsin Supreme Court had upheld the constitutionality of the Milwaukee Parental Choice Program against a challenge under Article X, Section 3, of the Wisconsin Constitution.[16] Davis v. Grover, 480 N.W.2d 460 (Wis. 1992); *see also* Jackson

---

[14] Article IX, Section 1(a), of the Florida Constitution reads, in relevant part: "The education of children is a fundamental value of the people of the State of Florida. It is, therefore, a paramount duty of the state to make adequate provision for the education of all children residing within its borders. Adequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education and for the establishment, maintenance, and operation of institutions of higher learning and other public education programs that the needs of the people may require."

[15] Meaning "[o]n the same subject; relating to the same matter." *Black's*, *supra* note 6, at 862. "It is a canon of construction that statutes that are *in pari materia* may be construed together, so that inconsistencies in one statute may be resolved by looking at another statute on the same subject." *Id.*

[16] Article X, Section 3, of the Wisconsin Constitution states, in relevant part: "The legislature shall provide by law for the establishment of district schools, which shall be as nearly uniform as practi-

v. Benson, 578 N.W.2d 602 (Wis. 1998) (upholding expansion of the Wisconsin program). While acknowledging that the education article in Davis was similar to the third sentence of section 1(a) of the Florida Constitution, the Florida court emphasized the fact that the Wisconsin education article did not "contain language analogous to the statement in article IX, section 1(a) that it is 'a paramount duty of the state to make adequate provision for the education of children residing within its borders.'" Holmes, 919 So. 2d at 407 n.10.

Like the Wisconsin Constitution, the Indiana Constitution contains no analogous "adequate provision" clause. And while the *in pari materia* reading of the second and third sentences of Florida's education article led the Florida Supreme Court to determine that the second sentence acted as a mandate and the third acted as a restriction, as noted above, we understand the imperatives of Article 8, Section 1, of the Indiana Constitution as imposing *two distinct duties* on the General Assembly. *See* Bonner, 907 N.E.2d at 520. Thus, the second duty of Article 8, Section 1, "to provide, by law, for a general and uniform system of Common Schools," even when applied *in pari materia*, cannot be read as a restriction on the first duty of the General Assembly to "encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement." Because both the language and the method of analysis of Florida's constitution differ from those of Indiana, we are not persuaded by any attempt to analogize the two education articles.[17]

The plaintiffs further argue that the voucher program does not "comply with the additional mandates of [the Education Clause] that the schools be 'uniform,' 'equally open to all,' and 'without charge.'" Appellants' Br. at 34. However, as discussed above, the Education Clause directs the legislature generally to encourage improvement in education in Indiana, and this imperative is broader than and in addition to the duty to provide for a system of common schools.

_____

cable; and such schools shall be free and without charge for tuition to all children between the ages of 4 and 20 years."

[17] Likewise, we are not persuaded by the plaintiffs' contention that we apply the canon of construction "*expressio unius est exclusio alterius*," or "the expression of one thing implies the exclusion of another." *See* Holmes, 919 So. 2d at 407. First, the use of canons of construction is unnecessary where our constitutional analysis leads unmistakably to a given result. Second, as discussed above, the first mandate given to the General Assembly ("to encourage, *by all suitable means . . .*"), Ind. Const. art. 8, § 1 (emphasis added), is a broad delegation of legislative discretion. We decline to so limit that discretion contrary to the framers' intent.

Each may be accomplished without reference to the other. Considering that the voucher-program statute does not alter the structure or components of the public school system, *see generally* Ind. Code §§ 20-51-4-1 to -11, it appears to fall under the first imperative ("to encourage") and not the second ("to provide"). The General Assembly's "specific task with performance standards ('general and uniform,' 'tuition without charge,' and 'equally open to all')," Bonner, 907 N.E.2d at 520, falls under the second imperative, "to provide, by law, for a general and uniform system of Common Schools," Ind. Const. art. 8, § 1, and is not implicated by the school voucher program.[18]

We conclude that plaintiffs have not established that the school voucher program conflicts with Article 8, Section 1, of the Indiana Constitution, and summary judgment for the defendants was thus proper as to this issue.

## 4. Article 1, Section 4

The plaintiffs assert that the school voucher program violates Article 1, Section 4,[19] of the Indiana Constitution. Specifically, the plaintiffs argue that the voucher program is contrary to the decree that "no person shall be compelled to attend, erect, or support, any place of worship, or to maintain any ministry, against his consent." Ind. Const. art. 1, § 4.

We have previously held that the religious liberty protections in the Indiana Constitution "were not intended merely to mirror the federal First Amendment." City Chapel, 744 N.E.2d at 446.

> When Indiana's present constitution was adopted in 1851, the framers who drafted it and the voters who ratified it did not copy or paraphrase the 1791 language of the federal

---

[18] The same is true with respect to the plaintiffs' contention that the constitutional provision for the "Common School fund," Ind. Const. art. 8, § 2, which funds may be "appropriated to the support of Common Schools, and to no other purpose whatever," *id.* art. 8, § 3, implies that the General Assembly may only "fulfill its educational responsibility" through the public school system. Appellants' Br. at 33–34. That the school fund may only be used for support of the public schools, in no way limits the legislature's prerogative to appropriate other general funds to fulfill its duty to encourage educational improvement in Indiana.

[19] [Article 1,] Section 4. No preference shall be given, by law, to any creed, religious society, or mode of worship; and no person shall be compelled to attend, erect, or support, any place of worship, or to maintain any ministry, against his consent.

First Amendment. Instead, they adopted seven separate and specific provisions, Sections 2 through 8 of Article 1, relating to religion.

*Id.* at 445–46 (footnote omitted). For the most part, these separate provisions, including Section 4, were adapted from the 1816 Constitution. With respect to Section 4, we are guided by our examination in City Chapel, where we found that "there is little from the convention debates to amplify our understanding of the language of Section 4." *Id.* at 448. And thus the text of Section 4 is "our primary source for discerning the common understanding of the framers and ratifiers." *Id.*

The plaintiffs' argument under Section 4 focuses on the framers' text declaring that "no person shall be compelled to . . . *support*, any place of worship, or to maintain any ministry, against his consent." Ind. Const. art. 1, § 4 (emphasis added). The word "support," the plaintiffs contend, "includes the compelled payment of taxes that are used for religious purposes," whether the tax is a specific directive (e.g., forced contributions to a religious entity or a direct tax specifically earmarked for religious purposes), or general tax revenues used to "support" religious entities. Appellants' Br. at 16; *see also id.* at 16–17 n.14 (responding to the trial court's ruling).

This argument improperly expands the language of Section 4 and conflates it with that of Section 6. The former explicitly prohibits a person from being "compelled to attend, erect, or support" a place of worship or a ministry against his consent. This clause is a restraint upon government compulsion of individuals to engage in religious practices absent their consent. To limit the government's taxing and spending related to religious matters, the framers crafted Section 6, which restrains government not as to its compulsion of individuals, but rather its expenditure of funds for certain prohibited purposes. ("No money shall be drawn from the treasury, for the benefit of any religious or theological institution." Ind. Const. art. 1, § 6.) The two clauses were drafted to specify separate and distinct objectives in their respective restraints upon government: Section 6 prohibiting expenditures to benefit religious or theological institutions, and Section 4 prohibiting compulsion of individuals related to attendance, erection, or support of places of worship or ministry. "Worship" is a distinctively ecclesiastical function, and "[t]here is evidence that the noun 'ministry,' aside from its secular meanings, was understood at the time to mean '[e]cclesiastical function or profession; agency or service of a minister of the gospel or clergymen in the modern church, or priests, apostles, and evangelists in the ancient.'" Embry,

14

798 N.E.2d at 161 (plurality) (quoting Noah Webster, *An American Dictionary of the English Language* 716 (1856)).  We view these language distinctions between Sections 4 and 6 to be purposeful.[20]  *See* Warren v. Ind. Tel. Co., 217 Ind. 93, 101–02, 26 N.E.2d 399, 403 (1940) (citing State ex rel. Hovey v. Noble, 118 Ind. 350, 353, 21 N.E. 244, 245 (1889)) ("It has been said that the language of each provision of the Constitution is to be considered as though every word had been hammered into place."); Noble, 118 Ind. at 353, 21 N.E. at 245 ("But written constitutions are the product of deliberate thought.  Words are hammered and crystallized into strength, and if ever there is power in words, it is in the words of a written constitution."); *accord* Nagy, 844 N.E.2d at 484; Embry, 798 N.E.2d at 160; City Chapel, 744 N.E.2d at 447.  The religious liberty protections addressed by Section 4 prohibited government compulsion of individuals and was neither intended nor understood to limit government expenditures, which is addressed by Section 6.

We hold that Indiana's school voucher program does not violate Article 1, Section 4, of the Indiana Constitution, and that summary judgment for the defendants was thus proper as to this issue.

## 5.  Article 1, Section 6

The plaintiffs also assert that the school voucher program violates Article 1, Section 6, of the Indiana Constitution, which provides: "No money shall be drawn from the treasury, for the

---

[20] We acknowledge that a dispute exists among other states with respect to similar provisions. *See, e.g.*, Chittenden Town Sch. Dist. v. Dep't of Educ., 738 A.2d 539 (Vt. 1999) (concluding that, where neither party disputed the meaning of "support," reimbursements paid to a parochial school violated the "compelled support clause" of the Vermont Constitution because the schools were "places of worship").  However, the opposite conclusion was reached in Wisconsin, one of the states from whom our Section 6 was borrowed, *see Journal of the Convention of the People of the State of Indiana to Amend the Constitution* 964 (Austin H. Brown ed., 1851), based upon nearly identical constitutional language and arguments. *See* Jackson, 578 N.W.2d at 622–23 ("The Respondents additionally argue that the amended [voucher program] violates the 'compelled support clause' of art. I, § 18.  The compelled support clause provides 'nor shall any person be compelled to attend, erect or support any place of worship, or to maintain any ministry without consent . . . .'  The Respondents assert that since public funds eventually flow to religious institutions under the amended [voucher program], taxpayers are compelled to support places of worship against their consent.  This argument is identical to the Respondents' argument under the benefits clause.  We will not interpret the compelled support clause as prohibiting the same acts as those prohibited by the benefits clause.  Rather we look for an interpretation of these two related provisions that avoids such redundancy." (omission in original)).

benefit of any religious or theological institution." Ind. Const. art. 1, § 6. In assessing whether the program violates this clause, two issues are potentially implicated: (A) whether the program involves government expenditures for benefits of the type prohibited by Section 6, and (B) whether the eligible schools at which the parents can use the vouchers are "religious or theological institution[s]" as envisioned by Section 6. For the reasons set forth below, we hold that the school voucher program independently satisfies each of these two concerns, and thus for each reason does not run afoul of Section 6.

*A. Permissibility of Expenditures for Benefits*

We first find it inconceivable that the framers and ratifiers intended to expansively prohibit any and all government expenditures from which a religious or theological institution derives a benefit—for example, fire and police protection, municipal water and sewage service, sidewalks and streets, and the like. Certainly religious or theological institutions may derive relatively substantial benefits from such municipal services. But the primary beneficiary is the public, both the public affiliated with the religious or theological institution, and the general public. Any benefit to religious or theological institutions in the above examples, though potentially substantial, is ancillary and indirect. We hold today that the proper test for examining whether a government expenditure violates Article 1, Section 6, is not whether a religious or theological institution *substantially* benefits from the expenditure, but whether the expenditure *directly* benefits such an institution. To hold otherwise would put at constitutional risk every government expenditure incidentally, albeit substantially, benefiting any religious or theological institution. Such interpretation would be inconsistent with our obligation to presume that legislative enactments are constitutional and, if possible, to construe statutes in a manner that renders them constitutional. Section 6 prohibits government expenditures that directly benefit any religious or theological institution. Ancillary indirect benefits to such institutions do not render improper those government expenditures that are otherwise permissible.

As to this "benefits" issue, the plaintiffs contend that the program is unconstitutional under the reasoning of Embry v. O'Bannon, 798 N.E.2d at 160–67 (plurality), in which we reviewed a Section 6 challenge to the use of public funds for programs in parochial schools. In

16

Embry, four Indiana taxpayers brought suit challenging the Indiana dual-enrollment program. *Id.* at 158. The dual-enrollment program permitted "nonpublic school students enrolled in at least one specific class in the public school corporation to be counted in the [public school] corporation's ADM [(Average Daily Membership)]." *Id.* at 159. This provided the participating public school corporations with additional funding (proportional to the increase in ADM) and provided "various secular instructional services to private school students, on the premises of the private school, . . . [including] fitness and health, art, foreign language, study skills, verbal skills, music, and computer technology (including internet services)." *Id.* at 158–59. The plaintiffs in Embry contended that the dual-enrollment program "results in money being drawn from the state treasury to benefit parochial schools" in contravention of Article 1, Section 6, of the Indiana Constitution. *Id.* at 160. Specifically, the plaintiffs in Embry asserted that "the dual-enrollment agreements provide specific benefits to parochial schools because they make it unnecessary for the schools to hire and pay as many teachers, and because the schools may use the resources thus saved to expand curriculum and attract students." *Id.* at 166–67.

The holding in Embry was unanimous in concluding that the dual-enrollment program did not violate Section 6. *Id.* at 167 (three justices concurred in result).[21] We noted that, in determining compliance with this clause, Indiana case law "has interpreted Section 6 to permit the State to contract with religious institutions for goods or services, notwithstanding possible incidental benefit to the institutions, and to prohibit the use of public funds only when directly used for such institutions' activities of a religious nature." Embry, 798 N.E.2d at 167 (plurality); *see* State ex rel. Johnson v. Boyd, 217 Ind. 348, 28 N.E.2d 256 (1940); Ctr. Twp. of Marion Cnty. v. Coe, 572 N.E.2d 1350 (Ind. Ct. App. 1991). It was this rubric that we applied in Embry. 798 N.E.2d at 166–67 (plurality).

---

[21] In Embry, Justice Dickson authored the lead opinion for the Court, which was joined by Justice Rucker in full, discussing without deciding whether religious schools were "institutions" within the meaning of Section 6 and ultimately deciding the case based upon the "for the benefit of" language of Section 6. Embry, 798 N.E.2d at 160–67. Chief Justice Shepard concurred in result without any written opinion. *Id.* at 167. Justice Sullivan concurred in result with respect to Section 6, and otherwise concurred in part, writing an opinion with respect to the issue of standing (which was joined by Chief Justice Shepard). *Id.* at 167–69. Justice Boehm concurred in result, with a written opinion (joined by Justice Sullivan), disagreeing "with the majority insofar as it concludes or implies" that religious schools are not "institutions" within the meaning of Section 6, *id.* at 169, but ultimately "agree[ing] that the legislation involved in this case is constitutional because it does not expend funds for the benefit of a religious institution," *id.* at 170. We intend today's opinion to bring resolution to these issues.

17

We now recognize, however, that our language and holding in Embry was less than plain, and the division of our votes and separate opinions somewhat inconclusive. We thus take this opportunity to revisit and resolve the issue. Our use of the phrase "substantial benefits" in Embry was not intended, as the plaintiffs here appear to have understood it, to denote a measurable line after which any benefit to a religious or theological institution becomes unconstitutional. *See id.* at 167 (plurality) ("[T]he dual-enrollment programs permitted in Indiana do not confer substantial benefits upon any religious or theological institution . . . ."). Such is neither conducive to judicial application nor a workable guide for the legislature. Rather than a quantifiable sum, "substantial benefit" was used in the context of determining the primary or direct beneficiary under the program at issue.

The plaintiffs assert that "the absence of any requirement that participating schools segregate the public funds they receive . . . necessarily will *directly* fund the religious activities that take place in these schools," and that the voucher program "substantially" benefits these schools financially and by "promot[ing] these schools' religious mission" by adding to their enrollment students who otherwise would not be able to afford the tuition. Appellants' Br. at 20–21. We disagree because the principal actors and direct beneficiaries under the voucher program are neither the State nor program-eligible schools, but lower-income Indiana families with school-age children.

The direct beneficiaries under the voucher program are the families of eligible students and not the schools selected by the parents for their children to attend. The voucher program does not directly fund religious activities because *no* funds may be dispersed to *any* program-eligible school without the *private, independent selection by the parents of a program-eligible student*. Participation in the voucher program is entirely voluntary for parents of eligible students. Beyond the requirement that the non-public schools meet the benchmark curriculum requirements in order to be eligible to receive program students—eligibility which is in no way limited to religious schools—the State plays no role in the selection of program schools. The funds are provided for the eligible students' education, and the parents determine where that education will be received. Thus, any benefits that may be derived by program-eligible schools are

18

ancillary to the benefit conferred on families with program-eligible children. As the plaintiffs acknowledge, the tuition costs required to attend a non-public school generally foreclose the option for lower-income families. *Id.* at 21 ("[E]ducation to children who otherwise would not have received it . . . . [C]hildren who otherwise would not be exposed to it."). The voucher program helps alleviate this barrier by providing lower-income Indiana families with the educational options generally available primarily to higher-income Indiana families. The result is a direct benefit to these lower-income families—the provision of a wider array of education options, a valid secular purpose. Any benefit to program-eligible schools, religious or non-religious, derives from the private, independent choice of the parents of program-eligible students, not the decree of the State, and is thus ancillary and incidental to the benefit conferred on these families.

The plaintiffs respond that the notion that the "State is simply giving away tax revenues to citizens who are free to make their own decisions about how to use those funds" is a "pretense" and "grossly misleading." *Id.* at 27. They contend that the parents of program-eligible students "have no discretion" because the funds may only be used for tuition at program-eligible schools. *Id.* But the schools eligible under the program are not limited to religious schools. The parents are not limited to choosing religious schools. Nor are the parents required to participate in the voucher program, but may keep their children in a public or charter school. We find that the only direct beneficiaries of the school voucher program are the participating parents and their children, and not religious schools. The program does not contravene Section 6 by impermissibly providing direct benefits to religious institutions.

*B. Schools As "Religious or Theological Institution[s]" Under Section 6*

In Embry, the lead opinion began to explore whether the framers and ratifiers of Indiana's 1851 Constitution intended the phrase "religious or theological institution[s]" to include schools and educational institutions. *See* Embry, 798 N.E.2d at 161–64 (plurality). In reviewing the proceedings at the Constitutional Convention and the context of its contemporaneous history, however, we did find that to the extent that primary and secondary education was available to Indiana children, it was predominantly provided by private or religious entities. *Id.* at 162 (quoting Donald F. Carmony, *Indiana 1816–1850: The Pioneer Era* 393 (1998)) ("By 1845–50, it is

19

estimated that 'less than half of the youth between ages five and twenty-one attended such schools for as much as three months in a year' and '[n]umerous of these schools were private or denominational schools, recognized and in part financed from taxes and proceeds from public school funds.'").  It was generally accepted that the teaching of religious subject matter was an essential component of such general education.  *See, e.g.*, An Act to Provide for a General System of Common Schools, [etc.], 1865 Ind. Acts 1, § 167, *reprinted in* 1 Edwin A. Davis, *Statutes of the State of Indiana* 815 (1876) ("The bible shall not be excluded from the public schools of the state."); Richard G. Boone, *A History of Education in Indiana* 267 (1892) (noting the Board of Education's recommended textbooks in the 1850's and 1860's, which included *The American School Hymn Book* and *The Bible*); McCarthy & Zhang, *supra*, at 226–27.  While certainly favorable to advancing the role of government in providing education through common schools, the framers did not manifest an intent to exclude religious teaching from such publicly financed schools.  *See, e.g.*, Embry, 798 N.E.2d at 163 n.5.

We are also mindful that in 1851, when Indiana's framers and ratifiers adopted Section 6, they were crafting the sole limits upon state government with respect to religion.  The U.S. Constitution was not a factor.  The First Amendment had not yet been extended to apply to state government.  *See* Barron v. Mayor of Baltimore, 32 U.S. (7 Pet.) 243, 250, 8 L. Ed. 672, 675 (1833) ("These amendments demanded security against the apprehended encroachments of the general government—not against those of the local governments.  In compliance with a sentiment thus generally expressed, to quiet fears thus extensively entertained, amendments were proposed by the required majority in Congress, and adopted by the States.  These amendments contain no expression indicating an intention to apply them to the State governments.  This court cannot so apply them.").

In light of the prevailing social, cultural, and legal circumstances when Indiana's Constitution was enacted, we understand Section 6 as not intended to prohibit government support of primary and secondary education which at the time included a substantial religious component.  This interpretation is consistent with the presumption of constitutionality which we apply when reviewing a claim of statutory unconstitutionality.

For these reasons, we hold that the phrase "religious or theological institution[s]" in Section 6 of the Indiana Constitution was not intended to, nor does it now, apply to preclude government expenditures for functions, programs, and institutions providing primary and secondary education.

Thus, we separately and independently find as to each of the two issues that the school voucher program does not contravene Section 6. First, the voucher program expenditures do not directly benefit religious schools but rather directly benefit lower-income families with schoolchildren by providing an opportunity for such children to attend non-public schools if desired. Second, the prohibition against government expenditures to benefit religious or theological institutions does not apply to institutions and programs providing primary and secondary education. Summary judgment for the defendants was thus proper as to the plaintiffs' Section 6 claims.

## Conclusion

We hold that the Indiana school voucher program, the Choice Scholarship Program, is within the legislature's power under Article 8, Section 1, and that the enacted program does not violate either Section 4 or Section 6 of Article 1 of the Indiana Constitution. We affirm the grant of summary judgment to the defendants.

Rucker, David, Massa, Rush, JJ., concur.

21

**ATTORNEYS FOR AMICI CURIAE**

**AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE**

Eric M. Hylton
Benesch, Friedlander, Coplan & Aronoff, LLP
Indianapolis, Indiana

**THE BECKET FUND FOR RELIGIOUS LIBERTY**

Kevin D. Koons
Kroger, Gardis & Regas, LLP
Indianapolis, Indiana

Eric Rassbach
The Becket Fund for Religious Liberty
Washington, D.C.

**THE CHRISTIAN ACADEMY OF MADISON, EVANSVILLE CHRISTIAN SCHOOL, HERITAGE CHRISTIAN SCHOOL, LIBERTY CHRISTIAN SCHOOL, LIGHTHOUSE CHRISTIAN ACADEMY, INDIANA CATHOLIC SCHOOLS OF THE ROMAN CATHOLIC DIOCESE OF INDIANAPOLIS, EVANSVILLE, FORT WAYNE-SOUTH BEND, GARY AND LAFAYETTE, AND THE INDIANA NON-PUBLIC EDUCATION ASSOCIATION**

Michael A. Wilkins
Broyles Kight & Ricafort
Indianapolis, Indiana

Bryan H. Beauman
Alliance Defense Fund
Paris, Kentucky

Gregory S. Baylor
Alliance Defense Fund
Washington, D.C.

John S. (Jay) Mercer
Mercer Belanger
Indianapolis, Indiana

Joshua D. Hershberger
Castor and Hershberger
Madison, Indiana

**THE COUNCIL OF CHRISTIAN COLLEGES AND UNIVERSITIES, HOLY CROSS COLLEGE, AND MARIAN UNIVERSITY**

Christopher J. Braun
Josh S. Tatum
Plews Shadley Racher & Braun, LLP
Indianapolis, Indiana

**THE FRIEDMAN FOUNDATION FOR EDUCATIONAL CHOICE**

Geoffrey Slaughter
Peter J. Prettyman
Taft Stettinius & Hollister, LLP
Indianapolis, Indiana

**THE INDIANA COALITION FOR PUBLIC EDUCATION, THE INDIANA SCHOOL BOARDS ASSOCIATION, THE INDIANA ASSOCIATION OF PUBLIC SCHOOL SUPERINTENDENTS, AND THE INDIANA ASSOCIATION OF SCHOOL BUSINESS OFFICIALS**

Joel D. Hand
The Law Offices of Joel D. Hand
Indianapolis, Indiana

William R. Groth
Fillenwarth Dennerline Groth & Towe, LLP
Indianapolis, Indiana

Lisa F. Tanselle
Indiana School Boards Association
Indianapolis, Indiana

**THE PACIFIC LEGAL FOUNDATION**

David J. Hensel
Pence Hensel, LLC
Indianapolis, Indiana

Chance D. Weldon
Pacific Legal Foundation
Sacramento, California