Rush, C.J., concurring in part and dissenting in part.
 

 I take no issue with my colleagues' conclusion that the plaintiffs have standing as taxpayers, or with their analysis that Article 8, Section 2 applies to civil forfeitures.
 

 I disagree with my colleagues, however, on two fronts. First, their broader discussion of the public-standing doctrine-properly characterized as dicta-is imprudent. It undercuts an important, long-recognized instrument for maintaining the separation of powers and checks and balances in Indiana, and it mistreats this Court's precedent. Second, I disagree that the current civil-forfeiture statute is constitutional. If the legislature enacts a civil-forfeiture scheme, the amount collected above the cost of obtaining the forfeiture must grow the Common School Fund. Here, the current statute's allocation scheme neither tracks offset costs nor increases the Fund. Thus, the legislature overstepped a constitutional limit on its authority.
 

 I therefore concur in result in Part I, concur in full in Part II, and dissent from Part III.
 

 A. Standing
 

 In my view, this Court's precedent in
 
 Cittadine
 
 ,
 
 Embry
 
 , and
 
 Meredith
 
 secured the plaintiffs' standing as taxpayers. So, no further discussion of standing is necessary. Yet, the lead opinion, in dicta, engages in lengthy criticism of both the public-standing doctrine and this Court's precedent-criticism to which I cannot subscribe.
 

 To start, the public-standing doctrine, properly limited, does not undermine the separation of powers. Rather, it serves an important role in maintaining the separation of powers, with checks and balances, in state government. While the general rule of standing certainly helps the judiciary refrain from wading into waters reserved for the other branches, the public-standing doctrine helps ensure that the legislature and executive do not go beyond the boundaries of their authority.
 
 See
 

 State ex rel. Cittadine v. Ind. Dep't of Transp.
 
 ,
 
 790 N.E.2d 978
 
 , 979-82 (Ind. 2003). It allows the judiciary to step in when necessary to keep the branches within their limited spheres.
 

 Id.
 

 ;
 
 accord
 

 Sprague v. Casey
 
 ,
 
 520 Pa. 38
 
 ,
 
 550 A.2d 184
 
 , 187 (1988) ;
 
 see also
 

 Project Extra Mile v. Neb. Liquor Control Comm'n
 
 ,
 
 283 Neb. 379
 
 ,
 
 810 N.W.2d 149
 
 , 159-60 (2012).
 

 This is an essential function and duty of the judiciary-to preserve the structure of government established by the People through the Constitution.
 
 Cf.
 

 Marbury v. Madison
 
 ,
 
 5 U.S. 137
 
 , 180,
 
 1 Cranch 137
 
 ,
 
 2 L.Ed. 60
 
 (1803) (observing responsibility of courts to the Constitution);
 
 City of Arlington v. FCC
 
 ,
 
 569 U.S. 290
 
 , 327,
 
 133 S.Ct. 1863
 
 ,
 
 185 L.Ed.2d 941
 
 (2013) (Roberts, C.J., dissenting) (observing judiciary's obligation "not only to confine itself to its proper role, but to ensure that the other branches do so as well"). Preserving that structure depends on effectively checking unconstitutional exercise of authority.
 
 See
 
 The Federalist Nos. 48 (James Madison) & 51 (Alexander Hamilton or James Madison). And the public-standing doctrine enables such a check in state government: it permits the People to procure the enforcement of a public right by invoking the judiciary's guardianship of the Constitution when the constitutional structure has been compromised.
 

 The absence of a comparable public-standing doctrine in the federal system is not a reason for us to eliminate this long-standing feature of Indiana law.
 
 See, e.g.
 
 ,
 
 Hamilton v. State ex rel. Bates
 
 ,
 
 3 Ind. 452
 
 , 458 (1852). Structural differences between the federal and state governments may call for different standing requirements. After all, the federal government has only the powers enumerated in the Federal Constitution.
 
 Murphy v. Nat'l Collegiate Athletic Ass'n
 
 , --- U.S. ----,
 
 138 S. Ct. 1461
 
 , 1475-76,
 
 200 L.Ed.2d 854
 
 (2018). State government, by contrast, has plenary power, limited only by the restrictions imposed by the federal and state constitutions.
 

 Id.
 

 When a state constitution imposes a limit on that power, less stringent standing demands may be necessary to keep government actors within their proper domains. Indeed, like Indiana, many other states have recognized that public standing has a rightful place in state law.
 
 See
 

 Cittadine
 
 ,
 
 790 N.E.2d at 982-93
 
 .
 

 Apart from my disagreement over the public-standing doctrine's role in maintaining the structure of and checks on our state government, I believe the lead opinion misrepresents, misreads, and maltreats this Court's decisions in
 
 Pence
 
 ,
 
 Cittadine
 
 ,
 
 Embry
 
 , and
 
 Meredith
 
 . It sees these opinions as presenting "doctrinal obfuscation" and "ostensibly competing theories" on the public-standing doctrine. Op. at 593-94. And it gives
 
 Cittadine
 
 "no precedential weight,"
 
 id.
 
 at 593, while also treating Justice Dickson's
 
 Embry
 
 opinion on standing as a plurality opinion,
 
 id.
 
 at 593, even though it garnered a majority, making it the Court's opinion. I view these cases differently.
 

 As a threshold matter, standing involves a general rule and an exception to that rule. The general rule is that the plaintiff must show a private injury, which is a harm different from that suffered by the general public. The exception is the public-standing doctrine. It is an exception because the plaintiff must show a public, rather than a private, injury. This doctrine has limits. And this Court has recognized some of them, including a requirement of extreme circumstances.
 
 [1]
 
 The Court has also recognized a category of public standing: taxpayer standing. This category applies when the plaintiff is a taxpayer challenging a legislative enactment as exceeding a specific constitutional limit on the exercise of the legislature's power over the state purse.
 

 This Court applied the general rule of standing in
 
 Pence v. State
 
 ,
 
 652 N.E.2d 486
 
 (Ind. 1995). In that case, Justice Dickson believed the exception, rather than the rule, should have applied.
 

 Id.
 

 at 489
 
 (Dickson, J., dissenting). The Court then unanimously applied the public-standing exception to the motorist-plaintiff in
 
 Cittadine
 
 ,
 
 790 N.E.2d at 984
 
 , explaining that the general rule applied in
 
 Pence
 
 because the circumstances of that case called for cautious restraint in the Court's exercise of judicial discretion.
 
 Cittadine
 
 ,
 
 790 N.E.2d at 983
 
 . In other words, in
 
 Pence
 
 , the reasons for applying the general rule outweighed the reasons for applying the exception.
 
 Cf.
 

 Green v. Obledo
 
 ,
 
 29 Cal.3d 126
 
 ,
 
 172 Cal.Rptr. 206
 
 ,
 
 624 P.2d 256
 
 , 267 (1981) (in bank) ("[T]he policy underlying the exception may be outweighed in a proper case by competing considerations of a more urgent nature ...."). The Court in
 
 Cittadine
 
 also explained both that "
 
 Pence
 
 did not alter the public standing doctrine in Indiana" and that the doctrine, though subject to limits, "continues to be a viable exception to the general standing requirement."
 
 790 N.E.2d at 983
 
 .
 

 Next, in
 
 Embry
 
 , a majority
 
 [2]
 
 of the Court relied on
 
 Cittadine
 
 to apply the public-standing exception to the taxpayer-plaintiffs.
 
 Embry v. O'Bannon
 
 ,
 
 798 N.E.2d 157
 
 , 159-60 (Ind. 2003). The Court later relied on this
 
 Embry
 
 majority in
 
 Meredith
 
 , when it unanimously observed that the exception applied to the taxpayer-plaintiffs.
 
 Meredith v. Pence
 
 ,
 
 984 N.E.2d 1213
 
 , 1217 n.4 (Ind. 2013).
 

 Thus,
 
 Cittadine
 
 is precedential; the Court's
 
 Embry
 
 opinion on standing is precedential; and to the extent
 
 Cittadine
 

 may
 
 conflict with
 
 Pence
 
 in applying the public-standing exception instead of the rule,
 
 Cittadine
 
 controls as the more recent and still-precedential decision. Ultimately, I see no "doctrinal obfuscation" in these cases-they indicate that taxpayer standing is a category of public standing, and that public standing applies only when cautious judicial restraint is outweighed by the need for the Court to ensure government actors stay within the confines of their authority.
 

 Under this Court's decisions in
 
 Cittadine
 
 ,
 
 Embry
 
 , and
 
 Meredith
 
 , the plaintiffs here have public standing under the taxpayer category: they are taxpayers who have alleged a public harm caused by legislative action that exceeds a specific constitutional limit on the legislature's authority over the purse-a limit this Court is responsible for safeguarding against legislative overreach. Since the plaintiffs have standing under that category, the lead opinion's broader discussion of the public-standing doctrine is dicta. And it is dicta that imprudently drives a knife into not only the heart of the judiciary's duty to ensure that each branch of government stays within its assigned lane, but also this Court's precedent and integrity as a decision-making institution.
 

 B. Constitutionality of the Civil-Forfeiture Statute
 

 In my view, Article 8, Section 2 imposes a condition on civil-forfeiture legislation: all forfeitures, save offset costs, must go to the Common School Fund. And because the current civil-forfeiture statute does not designate to the Fund all forfeitures, above the costs of obtaining them, it is unconstitutional.
 

 My colleagues reason that since the legislature may enact no civil-forfeiture statute at all, it must have unlimited authority to determine whether, when, and how a forfeiture "accrues" under Article 8, Section 2. But that reasoning doesn't add up.
 

 A constitutional provision that is "not self acting" can still limit governmental action. Put differently, the legislature may refrain from enacting a civil-forfeiture statute-but if it chooses to enact one, the Constitution may limit the legislature's authority in drawing the statute's contours. I believe Article 8, Section 2 does just that.
 

 The text, structure, and history of Article 8, Section 2 suggest that only the portion of a forfeiture that exceeds the cost of
 collecting it accrues to the Fund. So, I would hold that "all forfeitures which may accrue" in Article 8, Section 2 is all civil forfeitures minus offset costs necessary to obtain each forfeiture. In other words, to the extent my colleagues hold that expenses incurred in obtaining the forfeiture are not part of a forfeiture that accrues, I agree.
 

 But Article 8, Section 2 does not permit allocations
 
 apart from
 
 offset costs. To the contrary, offset costs, including incentives necessary to collect the forfeiture, prevailed in Indiana's past
 
 [3]
 
 because they were a means to increase the Fund.
 
 See, e.g.
 
 , Act of Mar. 10, 1873, ch. 7, §§ 2, 9, 11, 1873 Ind. Laws 18, 18-20. This Court has never held that a civil-forfeiture statute is constitutional even though the allocations bear no correlation to expenses incurred in obtaining the forfeiture.
 

 Here, under the current civil-forfeiture statute, any contributions to the Fund are not guaranteed and are capped at ten percent of the collected forfeiture. Without any showing that the allocations are offset costs of obtaining each forfeiture and that those offset costs serve to grow the Fund, the permissibility of offset costs does not save the statute from constitutional infirmity. Therefore, because the statute's allocation scheme does not increase the Fund or demonstrate a tie to expenses incurred in obtaining each forfeiture, the statute is unconstitutional.
 

 True, the plaintiffs here argue that Article 8, Section 2 permits no diversions from forfeitures, including offset costs. This argument goes too far. But the legislature also went too far. And it is our duty to ensure that each branch of government stays within the constitutional bounds of its authority. The majority's holding-that Article 8, Section 2 permits the legislature to essentially define "accrue"-not only makes that portion of the Constitution hollow; it also upsets the judiciary's vital role to interpret the Constitution.
 

 I therefore concur in part and dissent in part.
 

 David, J., joins in Part A.
 

 Slaughter, J., concurring in the judgment.
 

 I agree with the Court that the judgment below for Defendants and against Plaintiffs must be affirmed. But I reach that result for different reasons. I would hold that Plaintiffs lack standing under the
 only standard consistent with our Constitution's mandate of separate governmental powers. In my view, Article 3, Section 1 requires, among other things, that a plaintiff suffer individualized injury in fact and not a generalized harm indistinct from the public at large. Our prevailing judicial doctrines that permit taxpayer and citizen (also known as public-interest) standing are incompatible with this constitutional command. Although I have serious concerns with the way Indiana carries out civil forfeitures, see generally
 
 Leonard v. Texas
 
 , --- U.S. ----,
 
 137 S. Ct. 847
 
 ,
 
 197 L.Ed.2d 474
 
 (2017) (Thomas, J., respecting denial of certiorari), I would not reach the merits of Plaintiffs' constitutional claim. Instead, I would dismiss their complaint for lack of standing and await another case-brought by the State or by a private party with a concrete, particularized injury-to address the important constitutional questions that this and other civil-forfeiture cases implicate.
 

 I.
 

 Standing is an essential aspect of justiciability, which concerns the propriety and power of a court to hear a case and award relief. It also is central to separation of powers-the disbursal of governmental power among the three separate branches. A correct view of standing ensures that the complaining party is invoking the "judicial power", properly understood, and not asking the judiciary to ignore our constitutional structure or perform functions belonging to another branch.
 

 As James Madison explained in The Federalist No. 47, the principal reason for separating governmental power was to protect liberty and avoid tyranny. "The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." In the same essay, Madison addressed the threat to liberty if courts did not confine themselves to exercising judicial power. "[T]here can be no liberty ... if the power of judging[ ] be not separated from the legislative and executive powers[.]"
 

 Madison's concerns are reflected in our own Indiana Constitution, which divides state government into "three separate departments": "the Legislative, the Executive including the Administrative, and the Judicial". Ind. Const. art. 3, § 1. No official within one department "shall exercise any of the functions of another, except"-and this is a key qualification-"as in this Constitution expressly provided."
 

 Id.
 

 In other words, the only permissible deviation from strictly separate governmental powers arises when the Constitution itself permits it. One implication of this rule is that courts cannot exercise the distinct powers allocated to the other branches.
 

 Our Constitution assigns to courts the responsibility for exercising the "judicial power": "The judicial power of the State shall be vested in one Supreme Court, one Court of Appeals, Circuit Courts, and such other courts as the General Assembly may establish."
 

 Id.
 

 art. 7, § 1. This delegation of the judicial power prompts this central question: What, precisely, are the contours of the "judicial power", which only courts may exercise? The answer begins with a proper conception of standing, which permits courts to adjudicate a claim only to the extent the plaintiff has sustained an actual injury and seeks to vindicate a private right.
 

 A.
 

 As we have recognized, standing is a "threshold" question for the courts,
 
 Pence v. State
 
 ,
 
 652 N.E.2d 486
 
 , 487 (Ind. 1995), and a "key component in maintaining our
 state constitutional scheme of separation of powers."
 

 Id.
 

 at 488
 
 . Standing imposes a "significant restraint on the ability of Indiana courts to act" because it "denies the courts any jurisdiction absent an actual injured party participating in the case."
 

 Id.
 

 This requirement of an "actual injured party" is not merely a prudential matter that courts can enforce or ignore as they see fit. It is, rather, a mandate that flows necessarily from our constitutional scheme of divided governmental powers.
 

 We observed in
 
 Pence
 
 that, unlike the federal Constitution, our state Constitution has no explicit "case or controversy" requirement.
 

 Id.
 

 That remains largely true today, except for a 2018 amendment to Article 10, Section 5. But despite the lack of a general case-or-controversy mandate, "our explicit separation of powers clause fulfills a similar function."
 

 Id.
 

 Thus, the requirement of a case or controversy is implicit in our Constitution's express separation-of-powers mandate.
 

 Just last year, the People amended our State Constitution to require the general assembly to adopt a balanced budget unless two-thirds of each legislative chamber vote to suspend the requirement. Ind. Const. art. 10, § 5 (f). The amendment also provides specific judicial remedies for enforcing the provision and, relevant here, appears to contemplate that any such remedy must arise in connection with a "case or controversy".
 

 A court that orders a remedy pursuant to any case or controversy arising under this section may not order any remedies other than a declaratory judgment or such other remedies that are specifically authorized by the General Assembly in a law implementing this section.
 

 Id.
 

 art. 10, § 5 (g). Because our recent standing precedent has ignored the implicit case-or-controversy requirement within Article 3, Section 1, it is noteworthy that this amendment leaves no doubt that a plaintiff's generalized injury will not suffice to confer standing.
 

 Our standing case law holds it is insufficient that a plaintiff merely has a general interest common to all members of the public. "[O]nly those persons who have a personal stake in the outcome of the litigation and who show that they have suffered or were in immediate danger of suffering a direct injury as a result of the complained-of conduct will be found to have standing."
 
 State ex rel. Cittadine v. Indiana Dep't of Transp.
 
 ,
 
 790 N.E.2d 978
 
 , 979 (Ind. 2003) (citations omitted). But we stray from our requirement of an actual or imminent direct injury when claimants seek to enforce
 
 public
 
 rights or interests. "[W]hen a case involves enforcement of a public rather than a private right the plaintiff need not have a special interest in the matter nor be a public official."
 

 Id.
 

 at 980
 
 (citations omitted).
 

 B.
 

 The Court's opinion today treats public standing and taxpayer standing as "distinct", though the Court acknowledges some degree of "overlap" between these two doctrines. Public standing refers to a private litigant's enforcement of a public right-often challenging governmental action believed to be illegal or unconstitutional. Taxpayer standing refers to a private litigant's specific kind of legal challenge-usually to an allegedly unlawful appropriation or expenditure of public funds. See
 
 Embry v. O'Bannon
 
 ,
 
 798 N.E.2d 157
 
 (Ind. 2003).
 

 On this point, I am closer to the Chief Justice's view that taxpayer standing is a "category" or subset of public standing. The strong interrelationship, however, between public and taxpayer standing does not save either doctrine but condemns them both. The Chief Justice notes that
 these doctrines-court-created exceptions to actual-injury standing-are not new to our jurisprudence but a "long-standing feature of Indiana law". That is true. But the long lineage of these exceptions does not make their pedigree noble.
 

 When courts entertain a plaintiff's claim to vindicate a public right, we disrespect a key portion of the foundational bargain that "WE, the People of the State of Indiana" struck. Ind. Const. pmbl. In 1816 and again in 1851, the People exercised "the right to choose our own form of government",
 

 id.
 

 , and could not have been clearer that they were vesting the "executive power of the State" not in the courts or in private citizens but "in a Governor",
 

 id.
 

 art. 5, § 1, whose most solemn duty is to "take care that the laws are faithfully executed."
 

 Id.
 

 art. 5, § 16. When we confer standing on citizens having no particularized injury and whose only interest in the case is their shared, common interest "with other citizens in the execution of the law",
 
 Wampler v. State ex rel. Alexander
 
 ,
 
 148 Ind. 557
 
 , 572,
 
 47 N.E. 1068
 
 , 1072 (1897), we invade the executive's peculiar power, conferred by the People, to execute or enforce the law. Stated differently, courts disregard the governor's authority when we entertain suits by plaintiffs whose only claim is a generalized grievance indistinct from that of the public at large. Such a public-right claim to enforce the law should be brought, if at all, by the executive. A proper view of standing respects separation of powers by limiting courts to adjudicating only those disputes involving aggrieved parties with an actual, particularized injury.
 

 C.
 

 The Supreme Court of the United States, in
 
 Lewis v. Casey
 
 ,
 
 518 U.S. 343
 
 ,
 
 116 S.Ct. 2174
 
 ,
 
 135 L.Ed.2d 606
 
 (1996), explained the courts' role this way, describing both what that role is and what it is not:
 

 It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution.
 

 Id.
 

 at 349
 
 .
 
 Lewis
 
 thus reinforced the long-settled notion-dating at least to
 
 Marbury v. Madison
 
 , 5 U.S. (1 Cranch) 137,
 
 2 L.Ed. 60
 
 (1803) -that "[t]he province of the court is, solely, to decide on the rights of individuals".
 

 Id.
 

 at 170
 
 . The "rights of individuals", thus understood, do not mean public rights belonging generally to the public at large.
 
 Lujan v. Defenders of Wildlife
 
 ,
 
 504 U.S. 555
 
 , 578,
 
 112 S.Ct. 2130
 
 ,
 
 119 L.Ed.2d 351
 
 (1992).
 

 This view of the judiciary's limited role is not confined to the federal courts. In Indiana, this same understanding-that courts vindicate only private rights-dates at least to the mid-nineteenth century and predates our current 1851 Constitution. We held in
 
 Brewington v. Lowe
 
 ,
 
 1 Ind. 21
 
 (1848), that "[c]ourts of justice are established to try questions pertaining to the rights of individuals."
 

 Id.
 

 at 23
 
 . We went on to explain that a court's authority extends only to the vindication of individual rights "directly affecting the parties litigant".
 

 [U]nless some individual right, directly affecting the parties litigant, is thus brought in question so that a judicial decision becomes necessary to settle the matters in controversy between them relative thereto, the Courts have no jurisdiction; and it would be a perversion of the purposes for which they were instituted, and an assumption of functions that do not belong to them, to undertake to settle abstract questions of
 law in whatever shape such questions may be presented.
 

 Id.
 

 Brewington
 
 's modest view of the judicial role is not due to a stricter separation of powers under the 1816 Constitution. In words and substance, that charter's separation-of-powers mandate-contained in Article II-is no stricter than what prevails today. Like its 1851 counterpart, the 1816 version also created a tripartite system of governmental powers, prevented one department from exercising the powers of another, and said the only exceptions are those contained in the Constitution itself.
 

 The powers of the Government of Indiana shall be divided into three distinct departments, and each of them be confided to a separate body of Magistracy, to wit: those which are Legislative to one, those which are Executive to another, and those which are Judiciary to another: And no person or collection of persons, being of one of those departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.
 

 1816 Ind. Const. art. II.
 

 These federal and state authorities all point in one direction. They establish that Indiana's prevailing standing jurisprudence, reflected in cases such as
 
 Cittadine
 
 and
 
 Embry
 
 , violates separation of powers because it authorizes courts to adjudicate claims premised not only on private rights but also on public rights-whether asserted as public or taxpayer standing. We must return the judiciary to the limited role the People fashioned for us-adjudicating only those claims consistent with our constitutional structure. A necessary step is to limit standing accordingly.
 

 D.
 

 Standing is a core principle for identifying those disputes that are properly resolved in the courts. The judiciary must be vigilant in self-policing how we discharge the judicial power, lest we intrude on the powers of the other branches. The only concept of standing consistent with separate governmental powers requires the plaintiff to prove actual injury, causation, and redressability.
 

 First, the plaintiff must have suffered an injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.
 

 Lujan
 
 ,
 
 504 U.S. at 560-61
 
 ,
 
 112 S.Ct. 2130
 
 (cleaned up). In addition to being constitutionally compelled, this test has the added virtue of providing clear rules for litigants and lower courts to identify who can invoke the judicial power-and, just as important, who cannot.
 

 This approach stands in stark contrast to our recent standing rules, which have been anything but clear. In
 
 Pence
 
 , we recognized a narrow exception to injury-in-fact standing in "extreme circumstances",
 
 652 N.E.2d at 488
 
 , without specifying what that means or how it applies. More recently, in
 
 Cittadine
 
 , we relaxed that standard further and held that exceptions to traditional standing are not limited to extreme circumstances but reflect "our exercise of judicial discretion with cautious restraint under the circumstances."
 

 790 N.E.2d at 983
 
 . The assurance that we will exercise our discretion "with cautious restraint" is no restraint at all. Such a standardless benchmark for exercising the judicial power undermines the rule of law and amounts to an elastic, "we-know-it-when-we-see-it" yardstick that leaves standing principles open to the pleasure of courts. Yet courts are as susceptible as other human institutions to self-aggrandizement and the temptation to arrogate to ourselves power that properly belongs with others.
 

 Our fundamental law, ratified by the People in 1816 and again in 1851, recognized these risks. That is why these charters imposed strict limits on the exercise of governmental power, including the judicial power. And the only permissible exceptions to these strict limits were those each Constitution specifically authorized. Because courts have ultimate responsibility to say what the law is, we must be especially vigilant in resisting the allure of expanding our own authority by encroaching upon the power that the People committed to another branch.
 

 Our prevailing "come-one-come-all" approach to public and taxpayer standing does not, contrary to the Chief Justice's view, "maintain" separate governmental powers but undermines them. Our precedent authorizing generalized-injury standing, which the Chief Justice defends, proceeds from the erroneous premise that the only remedy for reining in an executive or legislature that has "overstepped" its legal authority lies with the courts. But not every legal wrong has a corresponding judicial remedy. Courts have no business entertaining suits to enforce the law brought by claimants lacking an actual, particularized injury. The recourse for such persons lies not in the courts but in the court of public opinion-meaning the electoral process and, ultimately, the ballot box. Such persons must make their case elsewhere-before politically accountable officials. As just one example, if unconstitutional legislation is threatened, those seeking to vindicate the public interest can petition the legislature not to enact it; they can persuade the governor not to enforce it; they can lobby the attorney general not to defend it. What they cannot do-unless the legislation aggrieves them personally-is obtain relief from the courts. This limitation on the role of courts is not a weakness of our system but one of its central strengths.
 

 E.
 

 I take seriously the strong pull of
 
 stare decisis
 
 . But if a prior decision is clearly wrong, we have no legitimate basis for perpetuating the error. Our obligation as state judges is to support, among other things, the "Constitution of the State of Indiana", not the erroneous judicial decisions interpreting it. I would revisit our standing precedent to the extent it permits claimants alleging only a generalized injury to vindicate public rights. That precedent cannot be reconciled with the system of divided governmental powers the People ratified in both our 1816 and 1851 Constitutions.
 

 II.
 

 Applying these principles here requires that we dismiss Plaintiffs' complaint. Police initially seized two of Plaintiffs' vehicles, belonging to the Horners, and the local prosecutor sought to forfeit them, claiming the Horners had used them to transport marijuana. The vehicles were eventually returned after the prosecutor dismissed the underlying criminal charges. The Horners and others later sued, alleging that Indiana's civil-forfeiture statute unlawfully diverts forfeiture proceeds from the common-school fund. Plaintiffs do not claim to have sustained an actual, particularized
 injury from the allegedly unlawful diversion of forfeiture revenues. To the contrary, they acknowledge their standing is based on their status as "citizens and taxpayers" of Indiana, meaning their purported injury is indistinct from that of the public at large. The judicial power, properly understood, does not extend to such generalized grievances. We should dismiss Plaintiffs' complaint and not reach the merits of their constitutional claim.
 

 As I understand the public-standing doctrine, "extreme circumstances" include situations in which dispensing the general standing requirements serves to maintain the separation of powers or is necessary to check whether a government actor has overstepped a specific boundary to its authority.
 

 My colleagues appear to treat Part I of Justice Dickson's opinion in
 
 Embry
 
 as a two-justice plurality: Justice Dickson joined by Justice Rucker. But Justice Sullivan explicitly concurred with this part.
 
 Embry v. O'Bannon
 
 ,
 
 798 N.E.2d 157
 
 , 167 (Ind. 2003) (Sullivan, J., concurring in part 1 and concurring in result in part 2) ("I concur in part 1 of the Court's opinion[.]"). True, Justice Sullivan wrote separately. But his separate concurrence did not alter his concurring vote with Justice Dickson's opinion on standing; it simply gave "more detailed attention" to that issue.
 

 Id.
 

 And although Justice Boehm voted "concur in result" for the opinion as a whole, he wrote, "I agree with the majority in the portion of its opinion concluding that plaintiffs have standing to assert their claims."
 

 Id.
 

 at 169
 
 (Boehm, J., concurring in result). So, the standing portion of Justice Dickson's
 
 Embry
 
 opinion garnered a majority with at least three-and possibly four-votes.
 

 Whether each of those allocation schemes was constitutional is less clear to me than to the majority. This Court never decided the constitutionality of those schemes. For example, in
 
 State ex rel. Attorney General v. Denny
 
 , the constitutionality of the statute was not before the Court.
 
 67 Ind. 148
 
 (1879). Rather, the plaintiffs contended that the former attorney general's actions violated the statute, and the Court addressed only that contention.
 

 Id.
 

 Similarly,
 
 State v. Elliott
 
 was a divided opinion in the Court of Appeals, not a decision of the Indiana Supreme Court, and it did not directly address the statute's constitutionality under Article 8, Section 2.
 
 171 Ind. App. 389
 
 ,
 
 357 N.E.2d 276
 
 (1976). That case concerned a plaintiff's attempt to recover funds that a judge had determined were mistakenly forfeited in the first place.
 

 Id.
 

 at 390
 
 , 357 N.E.2d at 277. The disagreement in the court was about whether that judicial determination permitted the plaintiff to recover the funds after they had arrived at their final destination, in the Treasurer's hands.
 
 Id.
 
 at 391-93, 357 N.E.2d at 277-79. The majority determined that was too late, because by the time the Treasurer had the funds, "such funds had clearly accrued to the Common School fund and could not properly be recovered,"
 
 id.
 
 at 393, 357 N.E.2d at 279. This conclusion, like the Court's decision in
 
 Denny
 
 , did not establish the statute's constitutionality under Article 8, Section 2. And each decision is far from a determination by this Court that the legislature has unlimited authority to define whether, when, and how accrual of a forfeiture occurs.